# EXHIBIT 18

```
NO:  X03-HHD-CV16-6067796S      :  SUPERIOR COURT

GERALYNN BOONE, ET AL           :  JUDICIAL DISTRICT
                                   OF HARTFORD

v.                              :  AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM            :  MARCH 2, 2018
PHARMACEUTICALS, INC., ET AL
```

                             MORNING SESSION

                BEFORE THE HONORABLE INGRID L. MOLL, JUDGE,
                             AND A JURY


A P P E A R A N C E S:

    Representing the Plaintiffs:

        ATTORNEY NEAL L. MOSKOW
        Ury & Moskow, LLC
        883 Black Rock Turnpike
        Fairfield, Connecticut  06825

        ATTORNEY ELLEN A. PRESBY
        ATTORNEY RICK NEMEROFF
        ATTORNEY KELLY KOHLER
        The Nemeroff Law Firm
        2626 Cole Avenue, Suite 450
        Dallas, Texas  75204

        ATTORNEY C. ANDREW CHILDERS
        Childers, Schlueter & Smith, LLC
        1932 North Druid Hills Road/Suite 100
        Atlanta, Georgia  30319

    Representing the Defendants:

        ATTORNEY PAUL SCHMIDT
        ATTORNEY PHYLLIS A. JONES
        ATTORNEY MICHAEL X. IMBROSCIO
        ATTORNEY GREGORY HALPERIN
        Covington & Burling LLP
        One City Center
        850 Tenth Street, National Waste
        Washington, DC  20001

        ATTORNEY PATRICK FAHEY
        Shipman & Goodwin
        One Constitution Plaza
        Hartford, Connecticut  06103


                            Recorded By:
                            Tammy Mullett

                            Transcribed By:
                            Tammy Mullett
                            Court Recording Monitor
                            101 Lafayette Street
                            Hartford, CT  06106

```
1    A   That's correct.

2    Q   Almost six years ago.

3    A   Yes.

4    Q   Actually, almost seven years ago now.

5    A   Yes, that's correct.

6    Q   Do you know if after May 12, 2011 the FDA identified

7   testing that Boehringer could do in order to learn the true

8   safety profile of its drug?

9            ATTY. SCHMIDT:  Objection, Your Honor.

10           Nondisclosed and subject to Your Honor's ruling.

11           THE COURT:  Attorney Moskow, do you wish to be

12           heard?

13           ATTY. MOSKOW:  I believe you already ruled on

14           it, Your Honor.

15           THE COURT:  All right.  Members of the jury, I'm

16           going to excuse you for a couple minutes.  Remember

17           the rules of juror conduct.  You can leave your

18           notepads on your chairs.  You can head into the jury

19           room at this time.

20           (Jury panel exits.)

21           THE COURT:  All right.  The jury has exited the

22           courtroom.  You may be seated.

23           All right.  Attorney Moskow, you wish to be

24           heard on this issue further, I think.

25           ATTY. MOSKOW:  Yes, Your Honor.  When we talked

26           yesterday about the Beasley paper coming in, you

27           indicated that it would be appropriate for us to not
```

1    to go out on a wild goose chase but that we would be

2    able to talk about the path forward and this -- I'm

3    about to talk about the path forward document.

4         THE COURT:  All right.  Attorney Schmidt, any

5    reply?

6         ATTY. SCHMIDT:  Yeah.  My first objection was

7    actually that this is not something that Dr. Plunkett

8    addressed in her report and notably she did not cite

9    the path forward document.  We mentioned that early

10   this morning to Mr. Moskow just so he was on notice.

11   I think it falls under Your Honor's ruling about

12   witnesses -- experts can't give new opinions that

13   aren't disclosed in their report.

14        ATTY. MOSKOW:  Your Honor, I'm rehabilitating

15   the witness now.  They locked her into an issue on

16   cross and now they can't let me explain why that --

17   her opinions still are valid based on the totality of

18   the information available.

19        ATTY. SCHMIDT:  I don't think the rule on proper

20   disclosure says if you ask a witness a question on

21   something -- I don't remember, to be honest, if Dr.

22   Plunkett discussed the Beasley article in her

23   reports.  But if you show her a document, that opens

24   the door for her to give new undisclosed opinions in

25   documents she didn't discuss.

26        ATTY. MOSKOW:  Your Honor, she was crossed on

27   it, so I couldn't -- I couldn't be in a position to

1    disclose everything, particularly based on the order

2    that we thought this issue was out.  But I think

3    we're perfectly -- it's perfectly appropriate to

4    rehabilitate the witness at this point based on that

5    testimony.

6        ATTY. SCHMIDT:  But that to me -- and that's

7    just an argument that if a witness gets crossed, they

8    can testify about anything and it comes under

9    rehabilitation.  I think the rules on proper

10   disclosure still apply.  The disclosure was made

11   months ago before Your Honor ever addressed this

12   issue, probably ever thought about this issue cause I

13   don't think we briefed it.  If it's not in there, we

14   can't have a new opinion that literally is framed in

15   the question as a failure to test question:  Did you

16   see the FDA tell Boehringer how to test this issue.

17   That's a new opinion.

18       THE COURT:  All right.  Attorney Moskow, in Dr.

19   Plunkett's report is there an opinion stated with

20   regard to the plaintiff's failure -- excuse me, the

21   plaintiff's claim that the defendants failed to

22   secure FDA approval of the 110 milligram dose?

23       ATTY. MOSKOW:  There is, Your Honor.  I may need

24   a moment to find it.  I don't know if it have it in

25   the courtroom so I may have to…

26       ATTY. SCHMIDT:  And if there is, then we'll

27   withdraw it.  We did not understand there to be;

1    that's why we raised this with Mr. Moskow in the

2    morning.

3         ATTY. MOSKOW:  Your Honor, may I just have two

4    minutes to find it?

5         THE COURT:  Yeah.

6         ATTY. SCHMIDT:  And just for record purposes, we

7    would obviously be withdrawing the disclosure

8    objection, not the failure to test objection.

9         THE COURT:  Understood.

10        ATTY. SCHMIDT:  Your Honor, I don't intend to

11   distract but --

12        ATTY. MOSKOW:  I have it.

13        ATTY. SCHMIDT:  Okay.  I'd like to say one more

14   thing when Mr. Moskow is done.

15        ATTY. MOSKOW:  This is paragraph 55 of Exhibit

16   5308, it's on page 35.

17        Documents show that BIPI continued to seek ways

18   to gain approval for a 110 milligram Pradaxa dose for

19   use in atrial fibrillation in the United States after

20   its approval in 2010.  The options having -- the

21   options being discussed included exposure monitoring

22   and performing a new clinical study referred to as a

23   dose titration study.  The documents show that the

24   exposure monitoring option was rejected by BI in part

25   due to the fact that pushing forward in the -- on the

26   use of RE-LY pharmacokinetic data to predict how to

27   assign a patient to Pradaxa dose would lead to

1    requiring measurements in all patients taking the

2    drug.

3         And then she goes on; I'll skip down a little

4    bit.

5         BIPI is clearly aware of the importance and

6    validity of blood level measurement for Pradaxa

7    patients at risk of bleeding events and the need to

8    consider dose individualization in some patient

9    groups yet BIPI's focus was on impacts of drug

10   marketing at the expense of patient safety.

11        ATTY. SCHMIDT:  And so based on that, Your

12   Honor, we'll maintain our objection because there's

13   nothing in there about interactions with the FDA or,

14   where Mr. Moskow was going, FDA's suggestions about

15   how that could be tested, including not citing the

16   document that contains the quote path forward.

17        I would also just note that I think this is

18   actually literally outside the scope of my cross

19   because my cross on Beasley -- and I -- this is why I

20   had the benefit of the overnight -- was intended to

21   be very tailored on the FDA's -- a response to the

22   lack of disclosure and the lack of consideration of

23   this 150 being too much issue.  We're now talking

24   about a separate issue which is getting approval for

25   the 110 which I don't think I covered.  I even went

26   so far at Mr. Moskow's request as to redact out the

27   title referencing approval of the 110.  It's a

1    different issue.  So it's also outside the scope.

2         ATTY. MOSKOW:  Your Honor, on page 394 -- or

3    actually the bottom of 393 and the top of her

4    deposition the question was asked, I want -- showing

5    her the Kurdys slide deck, which is Exhibit 19 -- I

6    want to ask you to just turn to the conclusions,

7    slide 14, and ask you if you agree.  The first

8    conclusion is higher dabigatran concentrations result

9    in lower probability of ischemic stroke, agree or

10   disagree with Dr. Kurdys?

11        Answer:  I would agree if what he's talking

12   about is looking at the general principle of risk.

13   That I would agree with.  I -- what I -- what I would

14   disagree with is that they were able -- the company

15   had not done the testing to define what the absolute

16   threshold might be.

17        So she was questioned about it at her deposition

18   and she identified that that was one of her opinions.

19        ATTY. SCHMIDT:  Actually, Your Honor, this is a

20   great example; further down on that page, 396, line

21   15, she was asked -- so the path forward

22   definitionally relates to activities after 2010.  She

23   was asked:  Do you know whether the company ever

24   submitted the 110 dose for approval in SPAF* after

25   its initial rejection in 2010?

26        Answer:  I've not seen a resubmission of that

27   data.  I've seen conversations of the company wanting

1    to do it and understanding that in order to do it

2    they would need some additional testing that I don't

3    see having that they did.

4         So she literally testified under oath that she

5    didn't even know if there was a further submission

6    let alone the response from the FDA about what the

7    substance of that submission was in terms of, well,

8    we don't agree with this but if you do this

9    hypothetical test, that might be enough.  So it's not

10   in her report.  In her deposition she actually

11   disclaimed knowledge of relevant facts.

12        ATTY. MOSKOW:  I don't see how -- I honestly

13   don't see how that comment, Your Honor, saying that

14   she didn't know whether the 110 had been resubmitted,

15   because it hadn't -- the FDA, as we'll show in a

16   moment, said they were rejecting the submission

17   because it did not meet their criteria.  So the point

18   here is that she has said -- and, actually, on that

19   same page, 396, her answer said:  I have not seen a

20   resubmission to them of that data.  I've seen

21   conversations of the company wanting to do it and

22   understanding in order to do it, they would have to

23   do some additional testing.  And I don't see having

24   that they did that.

25        So that's really where we are, Judge.  She told

26   them that this was a problem, that now opened the

27   door and the jury's left with the impression that the

1    FDA did something in 2011 and that was the end of the

2    story.  And I think without it, you know, we've

3    created a donut hole that swallowed the donut.

4        THE COURT:  All right.  The objection to that

5    question based on scope is sustained.  I obviously

6    listen to every question and answer very carefully,

7    but when it comes to the 110, I am laser focused on

8    what is said.  And when Attorney Schmidt asked his

9    questions concerning the 110 issue in the Beasley

10   report, the focus, as I understood it, and I can't

11   imagine that the jury was picking up something that I

12   didn't hear, the focus was not on BI's attempt to get

13   approval for a 110 dose.  I mean, am I just

14   completely without basis for saying that?  I don't

15   think so.  And you had the slide up on the screen

16   from the Beasley article, you asked -- is it Mr.

17   Shepard, your tech person --

18       ATTY. SCHMIDT:  Mr. Reynolds.

19       THE COURT:  -- asked him not to highlight the

20   language about the 110 dose.  The point was that the

21   FDA had the view that 150 was superior to warfarin.

22   And I didn't understand the theme of that line of

23   questioning to be these FDA -- BI's efforts to get a

24   110 approved.

25       So the way the question was phrased, Attorney

26   Moskow, is squarely within the claim that the Court

27   has found to be preempted under federal law.  So you

1    can ask Dr. Plunkett questions about what was asked

2    of her regarding the Beasley article, but the

3    question as posed goes beyond that in my view.

4         ATTY. MOSKOW:  Your Honor, may I make a proffer

5    for the record on 43 and then we can bring the jury

6    back in?

7         THE COURT:  Yup.

8         ATTY. MOSKOW:  For the record, Your Honor --

9    actually it's not Exhibit 43, it's Exhibit 18, I'm

10   sorry, Your Honor --

11        THE COURT:  It's all right.

12        ATTY. MOSKOW:  -- it's Exhibit 23.  And this was

13   the document that we have looked at several times;

14   it's the health authority contact report from October

15   27, 2011.  And, specifically, Judge, the point that

16   I'm talking about are the bullet points here towards

17   the bottom of the page which indicate, FDA's views

18   and approval of 110 milligram will best be served

19   with some type of monitoring.  FDA indicated a

20   potential path forward for the 110 milligram is as

21   follows; identified patients on 150 milligram with

22   the highest one third of exposure for 150 milligram;

23   confirm exposure such as using a thrombin test, then

24   move the patient to 110 milligram and retest exposure

25   with thrombin test to assure the exposure remains

26   appropriate; i.e. not the lowest one third of

27   exposure for 110 milligram and then follow patients

```
1          on 110 milligram.

2               And we believe that that path forward as

3          identified there is directly contrary to the language

4          that has just been presented to the jury on the

5          safety profile of the 150 being superior to 110.  And

6          that was why we offered it.  We understand the

7          Court's ruling.  I just wanted to make a record.

8               THE COURT:  Okay.  All right.  Attorney Sia, you

9          can retrieve the jury.

10               (Jury panel enters.)

11               THE COURT:  All right.  The members of the jury

12          have returned to the courtroom.  Everyone may be

13          seated.

14               All right.  Attorney Moskow, we'll go until

15          about ten after eleven and then we'll take our formal

16          morning recess even --

17               ATTY. MOSKOW:  Thank you, Your Honor.

18               THE COURT:  -- though the jury's gotten a couple

19          of breaks already.

20               ATTY. MOSKOW:  I'll do my best to speed us up.

21     BY ATTY. MOSKOW:

22     Q   Doctor, looking at May 12, 2011 date and knowing that

23     we're almost eight years since then, can you tell the jury

24     each and every test that you've seen Boehringer the company

25     perform with patients to determine whether 150 milligram is

26     too much?

27     A   I have not seen such studies done with -- especially
```

```
NO:  X03-HHD-CV16-6067796S        :  SUPERIOR COURT

GERALYNN BOONE, ET AL             :  JUDICIAL DISTRICT
                                     OF HARTFORD

v.                                :  AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM              :  MARCH 2, 2018
PHARMACEUTICALS, INC., ET AL
```

C E R T I F I C A T I O N

       I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Hartford, Connecticut, before the Honorable Ingrid L. Moll, Judge, and a jury, on the 2nd day of March, 2018.

       Dated this 4th day of March, 2018, in Hartford, Connecticut.


                        _____Tammy Mullett_____
                        Tammy Mullett
                        Court Recording Monitor