# EXHIBIT 1

```
 NO:  X03-HHD-CV16-6067796S        :  SUPERIOR COURT

GERALYNN BOONE, ET AL              :  JUDICIAL DISTRICT
                                      OF HARTFORD

v.                                 :  AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM               :  MARCH 22, 2018
PHARMACEUTICALS, INC., ET AL
```

BEFORE THE HONORABLE INGRID L. MOLL, JUDGE,
AND A JURY

A P P E A R A N C E S:

   Representing the Plaintiffs:

      ATTORNEY NEAL L. MOSKOW
      Ury & Moskow, LLC
      883 Black Rock Turnpike
      Fairfield, Connecticut  06825

      ATTORNEY RICK NEMEROFF
      ATTORNEY ELLEN A. PRESBY
      ATTORNEY KELLY KOEHLER
      The Nemeroff Law Firm
      Hillcrest Tower
      12720 Hillcrest Road, Suite 700
      Dallas, Texas  75230

      ATTORNEY C. ANDREW CHILDERS
      Childers, Schlueter & Smith, LLC
      1932 North Druid Hills Road/Suite 100
      Atlanta, Georgia  30319

   Representing the Defendants:

      ATTORNEY PAUL SCHMIDT
      ATTORNEY PHYLLIS A. JONES
      ATTORNEY MICHAEL X. IMBROSCIO
      ATTORNEY GREGORY HALPERIN
      ATTORNEY NICHOLAS HAILEY
      Covington & Burling LLP
      One City Center
      850 Tenth Street, NW
      Washington, DC  20001

      ATTORNEY PATRICK FAHEY
      Shipman & Goodwin
      One Constitution Plaza
      Hartford, Connecticut  06103

                                  Recorded and Transcribed By:
                                  Amanda Kizis
                                  Court Recording Monitor
                                  101 Lafayette Street
                                  Hartford, CT  06106

1    ATTY. MOSKOW:  Can we have a moment to switch
2    over, Your Honor?
3    THE COURT:  Yeah.
4    ATTY. NEMEROFF:  Let's start with the FDA.
5    First and foremost, this case is not about the FDA.
6    The FDA is not on trial.  The FDA isn't a part of
7    this case. Simple because their drug had to get
8    passed the FDA, but here's the issue interesting this
9    about the FDA, when we look at the FDA, what we keep
10   having to get back to is very -- what you'll see is
11   the law and this is not me making this up, this is --
12   THE COURT:  Attorney Nemeroff, I'm sorry to
13   interrupt you --
14   ATTY. NEMEROFF:  I'm sorry, I'm the same
15   problem.
16   THE COURT:  All right.  Thank you.
17   ATTY. NEMEROFF:  Thank you.  Sorry, Your Honor.
18   First I yell at you, now I'm too soft.  Can't
19   win.
20   This is the law, this is exactly what the law
21   says, this is what you'll hear from the jury charge,
22   under the law it is BI's duty and not the
23   responsibility of the FDA or anyone else to provide
24   warnings, instructions, and directions for use of
25   Pradaxa.  We continue to hear how the FDA wouldn't
26   let them do this, the FDA this, the FDA that, it's
27   their label.  They go to the FDA -- you saw half the

1        story where some of the things they wanted with 110,
2        and you saw half the story with some of the things
3        they wanted to do with 150, but what you never saw
4        was the FDA saying you couldn't tell them people over
5        80 were at risk. You didn't see the gastrointestinal
6        issues. You didn't say the same things that were put
7        in the European label being put in the same format in
8        the FDA and saying, no, that's too safe, you can't do
9        that. It's just not there.
10              What we did see though was Michelle Kliewer
11       being asked a lot of questions at what they didn't
12       give the FDA. You see the FDA can only do so much
13       unless they're given information. Use your
14       recollection. There was a lot of testimony about
15       what was sent to the FDA, what wasn't sent to the
16       FDA. Specifically, did you ever recommend to the FDA
17       that the measurements of dabigatran related to
18       anticoagulation may be helpful to avoid excessive
19       high exposures to dabigatran, in those words. No.
20              Is it true, yes or no, that your company never
21       communicated in sum or substance the section of this
22       EMA document that the 200 nanograms per milliliter
23       concentration is the value at trough not to be
24       exceeded because of the increased risk of bleeding?
25       No.
26              That's the EMA. That's the European Medical
27       Association. Counsel just told you that everything

1      went to the FDA, it all went to the FDA, not
2      according to regulatory affairs.  And if you
3      remember, Michelle Kliewer was the one who was the
4      interactive person with the FDA.  Just not true.
5      They didn't give the FDA all the information.
6           It just keeps going more.  This has not been
7      communicated and there's more.  And the next bullet
8      point, the next communication, did you communicate
9      these things to the FDA?  Nope.  Did you understand
10     is it fair to say you did not communicate this
11     information to the FDA that your company was of the
12     position or the opinion that the value of 215
13     nanograms per milliliter represented a conservatory
14     assessed cutoff value in their documents?  No.
15          So it's kind of a half story to say we told the
16     FDA everything, but so what we did -- and I agree,
17     facts matter, alternative facts matter less, which is
18     a lot of what you just heard.  What we did is we
19     actually called the Boehringer people who
20     communicated with the FDA, and you know what we said
21     to them, we said what did you send?  What did you
22     bring?
23          Michelle Kliewer is not lying when she tells you
24     she didn't send it to the FDA and this is just one of
25     a series of questions and answer that we asked her
26     about.  Don't be misled to think that just because
27     they say they sent it to the FDA, they did.  This is

1  stuff from the EMA label that was not communicate to
2  the FDA.
3      Blood monitoring. You're right we didn't bring
4  a specific outside expert doctor to talk about blood
5  monitoring. I'm sorry. I thought that when we put
6  on the CEO of the company, Ms. Brueckmann, Eberle,
7  Friedman, and Reilly, all doctors at Boehringer that
8  might've satisfied. I didn't know I needed to pay
9  hundreds of thousands of dollars like they do to
10 bring in all experts. Didn't realize that was
11 required of me. But we did do this. We played you
12 and we read to you these transcripts to show you that
13 the blood monitoring information, which was so useful
14 for doctors to have, was never communicated in the
15 United States to our doctors. This was in the EMA.
16 This was European but not here. So I'm not sure
17 where the concept that blood monitoring, that we
18 needed an expert to talk about the importance of
19 blood monitoring, we brought these folks here.
20     Labeling. You're right. I don't want to talk
21 about labeling anymore, but we have to. Because we
22 know that the key information, age 80 and above, rest
23 of the world, not here. Gastritis, GERD, prior GI
24 bleed, not here. Not to exceed 200 for a bleed, not
25 here. Testing for high bleed risk, not here. You're
26 right, words do matter. I can't imagine a doctor
27 looking at a label and thinking that's an unimportant

| | | |
|---|---|---|
| NO:  X03-HHD-CV16-6067796S | : | SUPERIOR COURT |
| GERALYNN BOONE, ET AL | : | JUDICIAL DISTRICT OF HARTFORD |
| v. | : | AT HARTFORD, CONNECTICUT |
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., ET AL | : | MARCH 22, 2018 |

C E R T I F I C A T I O N

     I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Hartford, Connecticut, before the Honorable Ingrid L. Moll, Judge, and a jury, on the 22nd day of March, 2018.

     Dated this 23rd day of March, 2018, in Hartford, Connecticut.

                                     ___Amanda Kizis_____
                                     Amanda Kizis
                                     Court Recording Monitor