# EXHIBIT 16

```
NO:  X03-HHD-CV16-6067796S            :   SUPERIOR COURT

GERALYNN BOONE, ET AL                 :   JUDICIAL DISTRICT
                                          OF HARTFORD

v.                                    :   AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM                  :   MARCH 14, 2018
PHARMACEUTICALS, INC., ET AL
```

                            MORNING SESSION

            BEFORE THE HONORABLE INGRID L. MOLL, JUDGE,
                            AND A JURY

A P P E A R A N C E S:

   Representing the Plaintiffs:

       ATTORNEY NEAL L. MOSKOW
       Ury & Moskow, LLC
       883 Black Rock Turnpike
       Fairfield, Connecticut  06825

       ATTORNEY ELLEN A. PRESBY
       ATTORNEY RICK NEMEROFF
       ATTORNEY KELLY KOEHLER
       The Nemeroff Law Firm
       Hillcrest Tower
       12720 Hillcrest Road, Suite 700
       Dallas, Texas   75230

       ATTORNEY C. ANDREW CHILDERS
       Childers, Schlueter & Smith, LLC
       1932 North Druid Hills Road/Suite 100
       Atlanta, Georgia   30319

   Representing the Defendants:

       ATTORNEY PAUL SCHMIDT
       ATTORNEY PHYLLIS A. JONES
       ATTORNEY MICHAEL X. IMBROSCIO
       ATTORNEY GREGORY HALPERIN
       ATTORNEY NICHOLAS HAILEY
       Covington & Burling LLP
       One City Center
       850 Tenth Street, National Waste
       Washington, DC  20001

       ATTORNEY PATRICK FAHEY
       Shipman & Goodwin
       One Constitution Plaza
       Hartford, Connecticut  06103


                              Recorded By:
                              Tammy Mullett

                              Transcribed By:
                              Tammy Mullett
                              Court Recording Monitor
                              101 Lafayette Street
                              Hartford, CT  06106

| | |
|---|---|
| 1 | THE COURT: All right. We're here in the matter |
| 2 | of *Geralynn Boone versus Boehringer Ingelheim* |
| 3 | *Pharmaceuticals, Inc., et al,* HHD-CV16-6067796. |
| 4 | Counsel, please identify yourselves for the record. |
| 5 | ATTY. MOSKOW: Good morning, Your Honor, Neal |
| 6 | Moskow, Ury Moskow, for the plaintiff. |
| 7 | ATTY. CHILDERS: Andy Childers on behalf of the |
| 8 | plaintiff, Your Honor. |
| 9 | ATTY. NEMEROFF: Rick Nemeroff and Ellen Presby |
| 10 | for the plaintiffs. |
| 11 | ATTY. PRESBY: Good morning, Your Honor. |
| 12 | ATTY. NEMEROFF: Just rearranging a bit, Your |
| 13 | Honor. |
| 14 | ATTY. JONES: Good morning, Your Honor, Phyllis |
| 15 | Jones for the defense. |
| 16 | ATTY. HAILEY: Good morning, Your Honor, Nick |
| 17 | Hailey for the defense. |
| 18 | ATTY. SCHMIDT: Good morning, Your Honor, Paul |
| 19 | Schmidt for the defense. |
| 20 | ATTY. FAHEY: Good morning, Your Honor, Patrick |
| 21 | Fahey for the defense. |
| 22 | THE COURT: All right. Good morning. All |
| 23 | right. The record will reflect that the courts ended |
| 24 | up being closed yesterday. |
| 25 | So any issues to take up before the jury comes |
| 26 | out? |
| 27 | ATTY. CHILDERS: Your Honor, we received a list |

1    of documents that are intended to be used with the
2    direct examination of Dr. Reilly and we'd have some
3    objections to several of them.  I don't know how you
4    would prefer to hear them:  one by one or sort of in
5    categories or…
6         THE COURT:  Well, give me a thumbnail sketch --
7         ATTY. CHILDERS:  Sure.
8         THE COURT:  -- of what the objections are going
9    to be.
10        ATTY. CHILDERS:  There are several documents
11   that are actually communications between the company
12   and the EMA regulatory body.  They're not -- they are
13   actual discussions back and forth between the two.
14   We believe that was something you'd already ruled on
15   that actual interactions with the regulatory --
16   foreign regulatory bodies, communications with the
17   regulatory bodies would not be permitted.
18        THE COURT:  All right.  When did I issue that
19   ruling?
20        ATTY. MOSKOW:  May I, Your Honor?
21        THE COURT:  Yeah.
22        ATTY. MOSKOW:  When we were in chambers the
23   morning of opening and we talked about foreign
24   regulatory you said you would allow the label and
25   other information to come in for purposes of notice
26   but because the foreign regulatory standards are
27   different than the U.S. standards that this would not

1    be a mini trial with regard to how foreign regulatory
2    bodies dealt with issues. The documents in question
3    are the leg 43 process, which is precisely that.
4    That's the first part of the objection.
5        The second part of the objection is to the
6    extent that the leg 43 process deals with monitoring
7    and dose titration, that that's specifically the path
8    forward that plaintiffs have been precluded from
9    pursuing, so it would -- essentially after the
10    plaintiffs close their case allow for the opening of
11    an issue which we believe would be improper.
12        THE COURT: All right. Who's handling Dr.
13    Reilly?
14        All right. Good morning.
15        ATTY. HAILEY: Good morning, Your Honor. As to
16    the materials that Mr. Moskow and Mr. Childers
17    referenced, those were specifically submitted to the
18    FDA by the company. The company had interacted with
19    EMA but the exhibits that we're planning to use with
20    Dr. Reilly are follow-up communications between the
21    company and the FDA, so we think this should not be
22    subject to any potential exclusion of foreign
23    regulatory issues.
24        We'd also add that we don't believe that Your
25    Honor has excluded these foreign regulatory issues
26    more broadly or has reserved ruling on this. And
27    given that these were documents that were

1     specifically submitted to the FDA, we think it's
2     clearly relevant.
3            ATTY. MOSKOW:  Your Honor, before I respond, may
4     we ask that Dr. Reilly leave the courtroom?
5            ATTY. SCHMIDT:  Of course.
6            THE COURT:  Yeah, that's fine.
7            All right.  So the record will reflect that Dr.
8     Reilly has exited the courtroom.
9            ATTY. MOSKOW:  Thank you, Your Honor.  So this
10    actually begs the question because there are a whole
11    series of documents here.  In fact, the bulk of our
12    objections are to Dr. Reilly talking about any
13    communications with the FDA because he's incompetent
14    to do so.  It was not part of his job responsibility
15    to communicate with the FDA.  As the jury has already
16    heard, that was Michelle Kliewer's responsibility.
17    The documents that they have produced bear no Bates
18    number whatsoever so there's no indicia that he's
19    ever seen them before.  And pursuant to Code of
20    Evidence 63b as *Tate and LaPlante* notes in Section
21    6.4, A witness is incompetent if there isn't a
22    sufficient personal knowledge of the matters at
23    stake.  So on that issue alone the fact that it was
24    communicated to the FDA, this witness isn't competent
25    to testify to.
26           Now, I guess there's --
27           THE COURT:  But to the extent that Dr. Reilly in

1       fact communicated with the FDA, your objection is he
2       wasn't competent to do so?
3              ATTY. MOSKOW:  No.  If he did -- we don't
4       believe there will be testimony that he did because
5       the way Boehringer worked, it was Michelle Kliewer
6       who had contact and, in fact, every exhibit that
7       they've proposed with regard to the FDA is either
8       addressed to Michelle Kliewer or is addressed from
9       Michelle Kliewer; none of them bear any connection to
10      Dr. Reilly, at least on their face.  We can certainly
11      voir dire either in front of the jury or outside the
12      presence of the jury, but we don't believe that
13      there's a competent basis for him to offer those.
14             But I didn't want to leave this issue of foreign
15      regulatory, Your Honor -- and Mr. Hailey's argument
16      is precisely what we're concerned about.  So the jury
17      will be left with the impression that because the leg
18      43 doctrines were communicated to the FDA somehow the
19      FDA was okay with that.  And, in fact, what the FDA
20      said at or about the time that these documents were
21      provided was that you're still talking about the RE-
22      LY data and we're not going to consider anything you
23      have to say until you do a new test, the path
24      forward.  That's what they said in June of 2015,
25      that's what they said in October of 2011, that's what
26      they said in December of 2010.  And to the extent
27      that plaintiffs have been precluded from getting into

1           that issue, it would be totally improper for the
2           defendants now to be able to get into it on cross
3           after plaintiff has rested, so -- or on their case in
4           chief once plaintiff has rested.
5                   So not only are they regulatory -- foreign
6           regulatory documents, not only is Dr. Reilly
7           incompetent to testify to them, but to the extent
8           that they talk about titration and modeling and
9           there's a suggestion that the FDA got this and didn't
10          do anything, it leaves the plaintiff prejudiced
11          because plaintiff was not able to demonstrate that
12          the reason the FDA didn't do anything is because
13          they've already told the company what to do and they
14          haven't done it.
15                  THE COURT:  All right.  Mr. Hailey.
16                  ATTY. HAILEY:  In terms of Dr. Reilly's
17          competence to address these documents, I think he'll
18          testify today as to the fact that he was involved in
19          certain interactions with the FDA.  He may not have
20          been the person specifically responsible for
21          transmitting certain information but he interacted
22          with the FDA as part of the advisory committee, as
23          part of the approval process more broadly.
24                  We should -- and with respect to these specific
25          documents we should be entitled to lay the foundation
26          as to the fact that Dr. Reilly, you know, reviewed
27          those review memos contemporaneously on an ongoing

1       basis as part of his work.  So he should have the
2       opportunity to lay that foundation to the extent it's
3       not already there.
4               As to Mr. Moskow's point on the FDA making a
5       determination on dose adjustment, I believe the Court
6       already ruled on that as part of the Court's order on
7       plaintiff's motion in limine at docket 221.0.  The
8       Court denied without prejudice the same argument that
9       plaintiffs are making here as to whether the FDA
10      actually determined that dose adjustment was
11      necessary based on the fact that Boehringer submitted
12      these materials to the FDA.  So we shouldn't be
13      precluded from raising that argument here and putting
14      that argument into evidence with this witness.
15              More broadly I just say that BI here is accused
16      of hiding information from the FDA, of making
17      material misrepresentations to the FDA, and what we
18      intend to do with Dr. Reilly is discuss and respond
19      to those allegations and this evidence is necessary
20      to do so.  Thank you.
21              ATTY. SCHMIDT:  Your Honor, may I just add one
22      thing?
23              THE COURT:  You may.
24              ATTY. SCHMIDT:  The concern we have about the
25      laundry list of objections that we received this
26      morning and the motion that we received regarding Dr.
27      Reilly is that plaintiffs having rested their case

1    they're now asking for a completely different set of
2    standards to apply to our case that applied to their
3    case.  And let me just give a couple of examples.
4         Over our objection they were allowed to bring in
5    foreign labeling and show it to the jury and to use
6    it to directly say our labeling was inadequate.  But
7    they want to say that if we do an analysis and give
8    it to EMA, we can't do that.  That kind of line makes
9    no sense.
10        Over our objection they were allowed to ask at
11   least one witness questions about documents, Michelle
12   Kliewer, about documents that she had never seen.  We
13   went back last night -- Mr. Hailey looked at Dr.
14   Friedman's deposition; fully half the documents that
15   were shown to Dr. Friedman during his deposition were
16   documents they'd never seen.  They now want to say we
17   want to have the tightest rules possible for what you
18   can show your own witness.  That doesn't seem right
19   to wait until you rest your case and then suddenly
20   come forward and say your witness shouldn't even be
21   allowed to testify and if he does, we're going to
22   object to every document on principles that never
23   applied in the presentation of our case.
24        ATTY. MOSKOW:  So three things.  Let me address
25   the merits of the motion first and then I'll point
26   out the inaccuracies of counsel's argument.  So the
27   merits are, Your Honor, that --

1           THE COURT: The merits of which motion?

2           ATTY. MOSKOW: The merits of the foreign

3      regulatory and the EMA leg 43 process. The issue

4      there is not that the -- that Boehringer communicated

5      that it believes that the dose titration isn't

6      necessary or that it communicated that there's no

7      therapeutic range or that it communicated that they

8      don't see a utility of testing. The issue is the

9      EMA's response. And to the extent that the EMA

10     responded that they were satisfied with Boehringer's

11     information and then that is communicated to the FDA,

12     it leaves the impression that the FDA accepted EMA's

13     determination of the issue. And the fact is that in

14     June 30, 2015 when Boehringer tried to get more

15     information into the U.S. label the FDA said you

16     still haven't done what we asked you to do in 2010

17     and 2011. That has not been put in front of the jury

18     based on the Court's orders. You can't do an end run

19     around that now by allowing this analysis to come in

20     when we haven't been able to challenge exactly what

21     was presented to the EMA.

22          In fact, Your Honor, one of the reasons we

23     didn't -- you'll remember there was tumult the other

24     day when the BMJ article, you know, that -- the title

25     of which is to the effect that Boehringer hid

26     information from regulatory authorities. The reason

27     we didn't go into that article, which we think is

1      persuasive, is because we believed it might open the
2      door to this leg 43 and we didn't want to give Your
3      Honor any reason to think that we were trying to run
4      afoul of your order.
5           So we changed and -- and -- what's the word I'm
6      looking for -- we changed and presented our evidence
7      in keeping with the Court's instruction in chambers
8      that to the extent that foreign regulatory would come
9      in it would come in for notice and knowledge, not for
10     regulatory decision-making, and that's how we tried
11     our case.
12          Now, as it relates to evidentiary issues, I want
13     to be very clear, Your Honor.  We received this list
14     of -- it's either 47 or 49 exhibits at 7:56 last
15     night.  We spent until after midnight going through
16     it and determining what we could agree to and what we
17     couldn't.  The first thing we had to do was find out
18     whether Dr. Reilly was testifying as a corporate
19     witness or a fact witness.  That took an hour for us
20     to get an answer to that question and we were told in
21     fact he would be testifying as a fact witness.
22          Pursuant to the Court's prior rulings with
23     regard to Dr. Friedman, that means that learned
24     treatises are not appropriately shared with him and
25     yet a significant number of the exhibits that are on
26     his list are specifically learned treatises.  Now,
27     that wasn't a rule made up after we rested.  That was

1   an objection they made when we were going through Dr.
2   Friedman's play, Court Exhibit 4, and your Court --
3   and Your Honor sustained their objection to our using
4   learned treatise with Dr. Friedman because he had not
5   been disclosed as an expert. That rule should apply
6   here.
7       THE COURT: And he had never seen that article
8   before is what he testified to.
9       ATTY. MOSKOW: No. Your Honor, you testified --
10  your decision was based on the fact that it was
11  hearsay because he was not an expert witness and it
12  was an inappropriate use of a learned treatise with
13  someone who is not an expert witness.
14      THE COURT: Because there was no hearsay
15  exception that was satisfied in that context.
16      ATTY. MOSKOW: Well, I don't believe that that
17  was how the ruling was made on the record, Your
18  Honor, but we'll certainly address that on a case by
19  case basis here when we hear what Dr. Reilly intends
20  to testify to.
21      But as a practical matter, the rules that are
22  being applied here are exactly the same rules that
23  were applied to us on direct examination. For
24  example, several of the witnesses were shown the
25  Beasley paper, something that we didn't think was
26  appropriate to show them but, you know, based on an
27  overarching agreement, you know, we worked with that.

1       Likewise here there are specific treatises that Dr.
2       Reilly has worked on, they've been a part of, and
3       we're not interposing objections on those.  But on
4       the big picture here in terms of the rules applying
5       equally to both sides, we're absolutely in agreement
6       with that, and, you know, we adjusted our
7       presentation through Dr. Plunkett because those rules
8       were applied to us and we're certainly expecting that
9       the defendants will apply those rules as well.
10           In terms of the EMA documents, though, in terms
11      of the FDA regulatory documents, there needs to be a
12      showing that this witness actually communicated with
13      the FDA in order to bring them in.  I don't think on
14      those particular issues it's going to happen.  There
15      may be some early documents that had to do with the
16      NDA that they may be able to satisfy that but among
17      the documents that they're proposing to put into
18      evidence is the label change to add Praxbind to the
19      label.  Now, that was ruled out by the Court;
20      certainly something that the defendant -- the
21      plaintiff wasn't able to go into on direct.  And to
22      the extent that it's a label change, there's no
23      indication in the five days or four days of
24      depositions of Dr. Reilly that he had anything to do
25      with label changes.
26           So, you know, we're put in a position where
27      we're fully prepared to object as each document

```
 1            comes in and maybe do limited voir dire if that's
 2            necessary, but we believe that there are whole
 3            classes of documents that are just inappropriate for
 4            this witness.
 5                 THE COURT:  But how can I based on this record
 6            that has been established this morning make these
 7            sweeping evidentiary rulings that none of those
 8            documents are going to come in through Dr. Reilly?  I
 9            have no idea whether he has seen them before.  If he
10            saw them for the first time two days ago, they're not
11            going to probably come in.  So how can I make these
12            sweeping evidentiary rulings?  I mean, in terms of
13            the learned treatise comments that were made, all I
14            can do is address document by document, exhibit by
15            exhibit.  When something is moved in, if there's no
16            objection, I admit it in full.  If there's an
17            objection on hearsay grounds, if a hearsay exception
18            can't be satisfied or it's, you know, I can't
19            determine that it's nonhearsay, then it, you know…
20                 I'm just at a loss --
21                 ATTY. MOSKOW:  Sure.
22                 THE COURT:  -- as to how I'm to make these
23            sweeping rulings.
24                 ATTY. MOSKOW:  Well, 8-3(8) which is the learned
25            treatise exception to hearsay --
26                 THE COURT:  Right.
27                 ATTY. MOSKOW:  -- specifically by its term says
```

1          expert witnesses may be shown learned treatises.  Dr.
2          Reilly is not an expert witness.  He's a fact
3          witness.  There's never been a disclosure of any
4          documents that he has seen.  The first disclosure we
5          had of anything related to Dr. Reilly was at 7:56
6          last night despite the fact that they've known they
7          were calling him for quite a long time.  So I think
8          based on 8-3(8) the Court can rule as a matter of law
9          that he should not be shown learned treatises that he
10         did not offer.  And, you know, I think the law is
11         very clear on that one.  And, in fact, it's the same
12         objection that the defendants interposed with regard
13         to Dr. Friedman on Court Exhibit 4.  So that's one
14         category.
15              With regard to the EMA documents being sent to
16         the FDA, I think that's consistent with Your Honor's
17         prior rulings, whether they were in chambers or on
18         the record, that we're not going to have a sideshow
19         in terms of foreign regulatory bodies and foreign
20         regulatory standards, that to the extent that you
21         were allowing that to come in it was for notice and
22         knowledge.  It was consistent -- that information is
23         absolutely consistent with the company core
24         datasheet.  So there was a reasonable bright line for
25         that particular evidence.
26              We're now in a situation, Your Honor, where
27         the -- to the extent that the EMA documents come in,

1       they would be brought in to suggest that somehow the
2       matter has been resolved, and the Court is well aware
3       that to the extent that the path forward is an issue,
4       the plaintiff wasn't allowed to go into it and
5       preemption should not be a sword.  They can
6       certainly -- to the extent that the Court has ruled
7       and they're using preemption as a shield, we get it,
8       but now they can't eviscerate our case by claiming
9       that this has been resolved by the FDA when we
10      haven't been able to put on evidence to show that it
11      hasn't been.
12              THE COURT:  All right.  Attorney Schmidt.
13              ATTY. SCHMIDT:  Yeah, a couple quick points,
14      Your Honor.  On the timing point we followed the same
15      timing that they applied with us that we agreed to.
16      We went through the same process.  There's no
17      credible objection on the timing point.
18              On the EMA documents they literally want a world
19      where they can do what they want on foreign
20      regulatory pronouncements, including putting our
21      label from Europe up on the screen and saying with
22      Dr. Plunkett, Is this defective because -- is it
23      defective in America because it doesn't say what it
24      says in Europe, and we can't show what we believe is
25      important, relevant to our notice, relevant to our
26      knowledge in terms of our interactions with EMA.
27      That's in our view a double standard.  The things we

1      want to show from the European Medicine Agency, from
2      EMA, don't relate to the 110, they relate to this --
3      they're directly responsive to the attached, which we
4      think is wrong, that we had failed to study the
5      medicine properly.
6           On the learned treatise, I think -- my
7      recollection is as Your Honor expressed.  That was a
8      document that Dr. Friedman said he had never seen.
9      We're not going to show Dr. Reilly articles that he
10     has never seen.  He'll have a basis for saying -- for
11     testifying about them.  We think it's appropriate to
12     rule on as they come in.  My hope is that this is not
13     a disruptive exercise in terms of objecting every
14     time I show him a document.
15          THE COURT:  All right.  We're going to take this
16     on a question by question, exhibit by exhibit basis.
17          All right.  Any other issues before the jury is
18     brought in?
19          All right.  Someone can go get Dr. Reilly.
20          And, Attorney Sia, if you would get the jury,
21     please.
22          (Jury panel enters.)
23          THE COURT:  All right.  The members of the jury
24     have entered the courtroom.  Everyone may be seated.
25          Members of the jury, good morning.  Courts ended
26     up being closed yesterday so you wouldn't have been
27     able to come in anyway.  But good to see you this

```
 1       morning.
 2            All right.  We're ready to proceed with a
 3       defense witness.
 4            So, Attorney Schmidt, are you ready to call your
 5       next witness?
 6            ATTY. SCHMIDT:  Yes, we are.
 7            THE COURT:  All right.  You may proceed.
 8            ATTY. SCHMIDT:  Good morning, ladies and
 9       gentlemen.
10            Your Honor, as our first witness we will call
11       Dr. Paul Reilly to the witness stand, please.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
```

```
NO:  X03-HHD-CV16-6067796S        :    SUPERIOR COURT

GERALYNN BOONE, ET AL              :    JUDICIAL DISTRICT
                                        OF HARTFORD

v.                                 :    AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM               :    MARCH 14, 2018
PHARMACEUTICALS, INC., ET AL
```

C E R T I F I C A T I O N

     I hereby certify the electronic version is a true and correct transcription of the audio recording of the above-referenced case, heard in Superior Court, Judicial District of Hartford, Connecticut, before the Honorable Ingrid L. Moll, Judge, and a jury, on the 12th day of March, 2018.

     Dated this 15th day of March, 2018, in Hartford, Connecticut.

                             _____Tammy Mullett_____
                             Tammy Mullett
                             Court Recording Monitor