# EXHIBIT 6

```
NO:  X03-HHD-CV16-6067796S         :   SUPERIOR COURT

GERALYNN BOONE, ET AL              :   JUDICIAL DISTRICT
                                       OF HARTFORD

v.                                 :   AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM               :   MARCH 2, 2018
PHARMACEUTICALS, INC., ET AL
```

                    MORNING SESSION

     BEFORE THE HONORABLE INGRID L. MOLL, JUDGE,
                     AND A JURY


A P P E A R A N C E S:

   Representing the Plaintiffs:

       ATTORNEY NEAL L. MOSKOW
       Ury & Moskow, LLC
       883 Black Rock Turnpike
       Fairfield, Connecticut  06825

       ATTORNEY ELLEN A. PRESBY
       ATTORNEY RICK NEMEROFF
       ATTORNEY KELLY KOHLER
       The Nemeroff Law Firm
       2626 Cole Avenue, Suite 450
       Dallas, Texas   75204

       ATTORNEY C. ANDREW CHILDERS
       Childers, Schlueter & Smith, LLC
       1932 North Druid Hills Road/Suite 100
       Atlanta, Georgia  30319

   Representing the Defendants:

       ATTORNEY PAUL SCHMIDT
       ATTORNEY PHYLLIS A. JONES
       ATTORNEY MICHAEL X. IMBROSCIO
       ATTORNEY GREGORY HALPERIN
       Covington & Burling LLP
       One City Center
       850 Tenth Street, National Waste
       Washington, DC  20001

       ATTORNEY PATRICK FAHEY
       Shipman & Goodwin
       One Constitution Plaza
       Hartford, Connecticut  06103



                              Recorded By:
                              Tammy Mullett

                              Transcribed By:
                              Tammy Mullett
                              Court Recording Monitor
                              101 Lafayette Street
                              Hartford, CT  06106

1  are some patients for whom the 150 dose is too much.  Do you
2  remember giving that testimony several times with Mr.
3  Moskow?
4      A   Yes.
5      Q   You understand that this is an article where the FDA
6  in fact considers the question of whether the 150 milligram
7  dose is too much for certain patient groups.
8      A   Yes.  They describe -- that's not everything ---
9  that's not the only things that are in here but that
10 certainly is described.
11     Q   And that -- I'm going to focus just on that piece of
12 it.  Let's put the article up on the screen and go straight
13 to the authors.  These are these FDA authors that we were
14 talking about.  Correct?
15     A   Yes.
16     Q   And Dr. Unger, just to orient the jury, I think he
17 was a senior FDA official who was involved in approving
18 Pradaxa.  Correct?
19     A   Yes.  I believe we saw a memo from him.
20     Q   And you understand Dr. Temple is -- I've heard him
21 described as one of the deans of the FDA, a leading figure
22 at the FDA for many years.
23     A   Yes.  He's been there a long time.
24     Q   And he's well-regarded.
25     A   Yes.
26     Q   And if we look at the footer of the article, this is
27 an article that these FDA authors have published -- can we

1  call up the footer, Mr. Reynolds?
2          This is an article that these authors have published
3  in the *New England Journal of Medicine*.  Correct?
4     A   Yes, they did.
5     Q   And I think you spoke with Mr. Moskow about the
6  prestige of that publication in the medical field.
7     A   Yes.
8     Q   So let's just look at a couple things in this
9  article.  If you go to the left-hand column and call up just
10 this language here, I want to focus on this language: the
11 150 milligram regimen -- you understand this is talking
12 about Pradaxa.  Right?
13    A   Yes.
14    Q   Okay.  They say the 150 milligram regimen was
15 significantly superior to warfarin.  That's the language I
16 wanted to focus you on, Dr. Plunkett.  Do you understand
17 that to be the FDA's view regarding Pradaxa 150?
18    A   Certainly that was their view as described here, I
19 agree with that.
20    Q   Have you heard them in the time since express a
21 contrary view about Pradaxa versus warfarin?
22    A   There was some discussion about the comparison of
23 warfarin and Pradaxa, yes, in some other documents that
24 looks at things a little differently.  But I have not seen
25 them say that they take this back, if that's what you're
26 asking me.
27    Q   Yeah, that is what I'm asking you.  Now, let's look

1  language beginning with, It appeared, through the end of
2  that sentence.
3         Do you see where they reach the conclusion, It
4  appeared clear that most if not all patients should receive
5  the higher dose.  Do you see that??
6     A    Yes.
7     Q    The higher dose being the 150 milligram dose.
8     A    That's correct.
9     Q    So at least in this article the FDA disagrees with
10 the view that the 150 milligram dose is too high for older
11 patients and too high for patients with moderate renal
12 impairment.  Correct?
13    A    Yes.  They're also disagreeing with the company's
14 conclusions, but, yes.
15              ATTY. SCHMIDT:  Okay.  I'll move to strike that
16        last part of the answer as nonresponsive.
17              THE COURT:  Any objection?
18              ATTY. MOSKOW:  Yes, Your Honor.  I believe it
19        was responsive to the question as a whole.
20              THE COURT:  The motion to strike is granted.
21              ATTY. SCHMIDT:  Thank you.
22 BY ATTY. SCHMIDT:
23    Q    Dr. Plunkett, as the plaintiff's expert witness in
24 this case you've expressed various concerns about Pradaxa in
25 this courtroom.  Correct?
26    A    Yes.
27    Q    Is there anywhere outside this courtroom that you've

| | |
|---|---|
| 1 | FDA did something in 2011 and that was the end of the |
| 2 | story.  And I think without it, you know, we've |
| 3 | created a donut hole that swallowed the donut. |
| 4 | THE COURT:  All right.  The objection to that |
| 5 | question based on scope is sustained.  I obviously |
| 6 | listen to every question and answer very carefully, |
| 7 | but when it comes to the 110, I am laser focused on |
| 8 | what is said.  And when Attorney Schmidt asked his |
| 9 | questions concerning the 110 issue in the Beasley |
| 10 | report, the focus, as I understood it, and I can't |
| 11 | imagine that the jury was picking up something that I |
| 12 | didn't hear, the focus was not on BI's attempt to get |
| 13 | approval for a 110 dose.  I mean, am I just |
| 14 | completely without basis for saying that?  I don't |
| 15 | think so.  And you had the slide up on the screen |
| 16 | from the Beasley article, you asked -- is it Mr. |
| 17 | Shepard, your tech person -- |
| 18 | ATTY. SCHMIDT:  Mr. Reynolds. |
| 19 | THE COURT:  -- asked him not to highlight the |
| 20 | language about the 110 dose.  The point was that the |
| 21 | FDA had the view that 150 was superior to warfarin. |
| 22 | And I didn't understand the theme of that line of |
| 23 | questioning to be these FDA -- BI's efforts to get a |
| 24 | 110 approved. |
| 25 | So the way the question was phrased, Attorney |
| 26 | Moskow, is squarely within the claim that the Court |
| 27 | has found to be preempted under federal law.  So you |

1           can ask Dr. Plunkett questions about what was asked
2           of her regarding the Beasley article, but the
3           question as posed goes beyond that in my view.
4                   ATTY. MOSKOW:  Your Honor, may I make a proffer
5           for the record on 43 and then we can bring the jury
6           back in?
7                   THE COURT:  Yup.
8                   ATTY. MOSKOW:  For the record, Your Honor --
9           actually it's not Exhibit 43, it's Exhibit 18, I'm
10          sorry, Your Honor --
11                  THE COURT:  It's all right.
12                  ATTY. MOSKOW:  -- it's Exhibit 23.  And this was
13          the document that we have looked at several times;
14          it's the health authority contact report from October
15          27, 2011.  And, specifically, Judge, the point that
16          I'm talking about are the bullet points here towards
17          the bottom of the page which indicate, FDA's views
18          and approval of 110 milligram will best be served
19          with some type of monitoring.  FDA indicated a
20          potential path forward for the 110 milligram is as
21          follows; identified patients on 150 milligram with
22          the highest one third of exposure for 150 milligram;
23          confirm exposure such as using a thrombin test, then
24          move the patient to 110 milligram and retest exposure
25          with thrombin test to assure the exposure remains
26          appropriate; i.e. not the lowest one third of
27          exposure for 110 milligram and then follow patients