# EXHIBIT 7

```
NO:  X03-HHD-CV16-6067796S          :   SUPERIOR COURT

GERALYNN BOONE, ET AL               :   JUDICIAL DISTRICT
                                        OF HARTFORD

v.                                  :   AT HARTFORD, CONNECTICUT

BOEHRINGER INGELHEIM                :   MARCH 1, 2018
PHARMACEUTICALS, INC., ET AL
```

BEFORE THE HONORABLE INGRID L. MOLL, JUDGE,
AND A JURY

A P P E A R A N C E S:

   Representing the Plaintiffs:

      ATTORNEY NEAL L. MOSKOW
      Ury & Moskow, LLC
      883 Black Rock Turnpike
      Fairfield, Connecticut  06825

      ATTORNEY ELLEN A. PRESBY
      The Nemeroff Law Firm
      2626 Cole Avenue, Suite 450
      Dallas, Texas  75204

      ATTORNEY C. ANDREW CHILDERS
      Childers, Schlueter & Smith, LLC
      1932 North Druid Hills Road/Suite 100
      Atlanta, Georgia  30319

   Representing the Defendants:

      ATTORNEY PAUL SCHMIDT
      ATTORNEY PHYLLIS A. JONES
      ATTORNEY MICHAEL X. IMBROSCIO
      ATTORNEY GREGORY HALPERIN
      Covington & Burling LLP
      One City Center
      850 Tenth Street, National Waste
      Washington, DC  20001

      ATTORNEY PATRICK FAHEY
      Shipman & Goodwin
      One Constitution Plaza
      Hartford, Connecticut  06103

                                        Recorded By:
                                        Tammy Mullett

                                        Transcribed By:
                                        Tammy Mullett
                                        Court Recording Monitor
                                        101 Lafayette Street
                                        Hartford, CT  06106

1        patients and I'll read you some of the language.  If
2        we could pull up on the right-hand side of page one,
3        The FDA review team therefore sought to identify,
4        within RE-LY, a patient population for whom the
5        benefit-risk assessment of the 110 milligram of
6        dabigatran suggested superiority to the 150 milligram
7        dose.  Our analyses focused on elderly patients,
8        patients with impaired renal function and patients
9        with previous bleeding episodes.
10            The FDA goes on to explain why they thought the
11       150 dose was not too much for two of the very
12       populations for which Dr. Plunkett testified that the
13       150 dose was too much.  We believe it's plainly
14       relevant to cross-examine her on the fact that the
15       FDA disagrees with her opinion in that regard.
16            THE COURT:  All right.
17            ATTY. IMBROSCIO:  And I would just add, Your
18       Honor, and I have to apologize, Michael Imbroscio.
19       This article --
20            THE COURT:  You have to be in front of a mic
21       otherwise you won't get picked up.
22            ATTY. IMBROSCIO:  I'm sorry about that.
23            THE COURT:  That's all right.
24            ATTY. IMBROSCIO:  The other point is that this
25       article appears in a number of deposition
26       designations that we've worked on and I think there's
27       been no objection to this.  It's responsive to a lot

1 claim stronger but our understanding is it's out of
2 the case.
3     THE COURT: All right. Any brief reply?
4     ATTY. HALPERIN: Yes, Your Honor. We strongly
5 disagree that focusing on the FDA's determination
6 that the 150 dose was not too much for patients
7 somehow opens the door to a claim that Your Honor has
8 held is preempted under federal law.
9     THE COURT: Well, I think I'm seeing the issue
10 between your positions because I do think BI is
11 entitled to some latitude to build a defense that the
12 150 is not too much, that the FDA concluded that 150
13 is not too much for certain populations. So I think
14 the Beasley article is probably fair game. That
15 doesn't mean the entire thing comes in. Because
16 under our learned treatise rule, you know, it doesn't
17 mean that the entire article comes in. So we can
18 cross that bridge when we get to it. But, but, on
19 redirect I think plaintiff would be permitted to get
20 into what's now on the Elmo.
21     So, you know, the point of the preemption ruling
22 was the failure to secure FDA approval is not going
23 to be a, you know, standalone claim that goes to the
24 jury. But that doesn't necessarily mean that all
25 evidence now relating to the 110/150 distinction is
26 off limits. Because BI is entitled to develop a
27 defense that one, you know, to the plaintiff's theory

1  about that.  If you look at the back of the first page, just
2  at the top paragraph, it says, Read this medication guide
3  before you start taking Pradaxa and each time you get a
4  refill.  Correct?
5      A    Yes.
6      Q    Now, if we go back to the first page of the label,
7  you agree with me that this label is FDA approved.  Correct?
8      A    Yes, it is.
9      Q    And I want to talk about the FDA for a moment.  You
10 agree with me that the job of the FDA is that they are
11 responsible for protecting the public health by ensuring the
12 safety of drugs?
13     A    Yes, that's one of the things that they do.
14          ATTY. SCHMIDT:  May I approach, Your Honor?
15          THE COURT:  You may.
16          ATTY. SCHMIDT:  We'd move Exhibit 8011 into
17     evidence.
18          ATTY. MOSKOW:  No objection, Your Honor.
19          THE COURT:  Exhibit 8011 is admitted in full.
20 BY ATTY. SCHMIDT:
21     Q    Doctor, do you recognize 8011 if you look down in the
22 corner of the page that it is a printout from the FDA's
23 website with the URL "what we do"?
24     A    Yes, I have seen this before.
25     Q    You may have the same experience with the FDA
26 webpages that I have with them; you look at them, they look
27 good on the computer, and then when you try to print them

1   A   Yes, that is true, that is what they do.
2   Q   And you've seen various documents from the FDA where
3   they say we weigh strokes more heavily than bleeds.
4   A   I have seen that.
5   Q   They care more about preventing strokes -- I don't
6   want to say they care more, they're more concerned about
7   preventing strokes than they are about avoiding bleeds and
8   having strokes.  Correct?
9   A   I don't know if I put it quite that way.  I think
10  what they're discussing is the consequences -- they're
11  putting it into terms of patient consequences.  But I --
12  they do visit this issue, absolutely, in their decision
13  document.
14  Q   And you put it a better way than I did.  The FDA has
15  said that they view the consequences of a stroke as more
16  severe than the consequences of a bleed.
17  A   A specific kind of bleed though; they're talking
18  about intracranial hemorrhages is what they were worried
19  about.
20  Q   You've seen them say that they're very concerned
21  about trying to prevent strokes.  Right?
22  A   Yes, they are.
23  Q   Now, do you know that armed with this data on blood
24  concentration, on exposure, the modeling on how stroke
25  prevention changes with exposure, bleed risk changes with
26  exposure, the FDA specifically considered before approving
27  Pradaxa the question of monitoring?

1   A   Yes. Well, you need to be specific. You're talking
2 about routine monitoring, yes, they did.
3   Q   For example, do you still have 5793 in front of you?
4 That's the FDA advisory transcript.
5   A   I can get it.
6   Q   And I've got a clean copy if it would help.
7   A   No, I've got it.
8   Q   If you look at page 44, at the advisory committee on
9 the lower left-hand corner someone named Dr. McGuire asks
10 this question to Dr. Krudys who we saw was just presenting
11 these slides. Do you remember that?
12   A   Yes.
13   Q   And Dr. McGuire asks: Okay, then, Dr. Krudys, I have
14 some questions about your dose response relationships.
15       So that's what we just saw in the slides. Right?
16   A   Yes.
17   Q   I'm struck by what my eyeball tells me is about a
18 five-fold variability within 90 percent confidence of the
19 150 dose with regard to the steady-state concentration
20 achieved. That seems awfully big to me in a drug that we're
21 proposing to use without any therapeutic monitoring. So can
22 you put this in the context of other antithrombotic
23 therapies. Is this a usual variability interpatient and
24 also does this speak towards possibly considering
25 therapeutic monitoring of some sort?
26       Do you see that?
27   A   Yes.