IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF GEORGIA

COLUMBUS DIVISION

| | |
|---|---|
| VIRGINIA CHAMBERS, as surviving spouse of BOBBY LEE CHAMBERS, and on behalf of all legal heirs, and as executor of the Estate, | ) ) ) ) ) ) CIVIL ACTION NO. ) 4:15–CV–00068 |
| Plaintiff, | ) ) |
| vs. | ) NOVEMBER 1, 2018 ) ) PRETRIAL CONFERENCE |
| BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) |
| Defendant. | ) |

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE CLAY D. LAND,

UNITED STATES DISTRICT JUDGE

Proceedings recorded by stenography; transcript produced by computer.

BETSY J. PETERSON, CRR, RPR, CCR
Federal Official Court Reporter
Post Office Box 2324
Columbus, Georgia  31902
betsy_peterson@bellsouth.net

```
 1                        APPEARANCES

 2

 3   FOR THE PLAINTIFF:

 4        CHARLES ANDREW CHILDERS
          achilders@cssfirm.com
 5        Childers, Schlueter & Smith, LLC
          Attorneys at Law
 6        1932 N. Druid Hills Road, Suite 100
          Atlanta, Georgia  30319
 7        (404) 419-9500

 8        JASON B. BRANCH
          jason@philips-branch.com
 9        Philips Branch & Hodges
          1415 Wynnton Road
10        Suite A
          Columbus, Georgia  31906
11        (706) 323-6461

12

13

14   FOR THE DEFENDANT:

15        NEAL J. CALLAHAN
          njc@waldrepmullin.com
16        Waldrep, Mullin & Callahan, LLC
          111 Twelfth Street
17        Suite 300
          Columbus, Georgia  31902
18        (706) 320-0600

19        GREGORY L. HALPERIN
          ghalperin@cov.com
20        PAUL W. SCHMIDT
          pschmidt@cov.com
21        Covington & Burling LLP
          850 Tenth Street, NW
22        Washington, DC  2000-4956
          (202) 662-6000

23

24

25
```

1                          APPEARANCES (CONTINUED)

2

3        SHARLA J. FROST
         sharla.frost@tuckerellis.com
4        Tucker Ellis LLP
         405 Main Street
5        Suite 1000
         Houston, Texas   77002
6        (281) 657-0731

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22   COURT REPORTER:

23        BETSY J. PETERSON, CRR, RPR, CCR
          Federal Official Court Reporter
24        P. O. Box 2324
          Columbus, Georgia  31902
25        betsy_peterson@bellsouth.net

1          (Proceedings on November 1, 2018, commencing at
2          10:02 a.m., as follows:)
3               THE COURT:  Please be seated.  Good morning.  All
4     right.  This will be the final pretrial conference in the case
5     of Virginia Chambers versus — is it "bo-ring-er" or
6     "bo-rinj-er"?
7               MR. SCHMIDT:  It's actually "bare-ring-er," Your
8     Honor.
9               THE COURT:  "Bare-ring-er."
10              MR. SCHMIDT:  Yes.
11              All right.  "Bare-ring-er."
12              MR. SCHMIDT:  Thank you for asking.
13              THE COURT:  — Boehringer Ingelheim Pharmaceuticals,
14    Inc., Case No. 4:15-CV-68.
15              Let's first identify who is present for the parties.
16              For the plaintiff?
17              MR. CHILDERS:  Andy Childers, Your Honor, and Jason
18    Branch.
19              THE COURT:  Welcome.
20              MR. CHILDERS:  Thank you, Your Honor.
21              MR. CALLAHAN:  For the defense, Neal Callahan, Paul
22    Schmidt from New York, Gregory Halperin from Washington D.C.,
23    and Sharla Frost from Houston, Texas.
24              THE COURT:  Okay.  Good morning.
25              All right.  Just a few logistical matters first, and

1  then we'll get to some of the substantive issues that have been

2  raised in motions *in limine* and in the proposed pretrial order.

3           Of course, the case is set for trial to begin on

4  December 3rd at 9 a.m.  I have got two weeks set aside, but if

5  it were to go into that third week for jury deliberations, we

6  can handle that also.  So I'm still shooting for the two-week

7  goal, although I see from your pretrial filings that there's

8  some skepticism about that.  But that's what we're going to

9  shoot for, is to try to get this done in those first two weeks.

10  But certainly if we don't, I'm not going to declare a mistrial.

11  We will proceed into the next week if that is necessary.

12           Of course, that following week ends on Friday, the

13  21st; so if there's no verdict by the 21st, then we would

14  likely take a recess for the — well, I don't know if we'll

15  take a recess for the 24th or not, but we'll certainly take a

16  recess for the 25th.  So I just encourage everybody to keep all

17  that in mind as we try to get the case done well before

18  Christmas.

19           I'm going to start off with a trial day that starts

20  at nine and ends at six to try to make sure that we can get the

21  case done within our two weeks and are not here on Christmas

22  Eve or Christmas.

23           I generally take a lunch break for an hour and 15

24  minutes or so in the middle of the day and usually have usually

25  two other breaks of 15 minutes or so, one mid-morning break and

 1   one mid-afternoon break.

 2           We will pick a jury of 12.  There will be no

 3   alternates.  We will receive a verdict as long as we don't have

 4   fewer than six.  So if we lose a couple along the way, we will

 5   proceed as long as we don't get below six.

 6           As far as the *voir dire* goes, I generally conduct the

 7   *voir dire,* but I do allow lawyers to ask follow-up questions if

 8   they think there's something I have not covered.  And lawyers

 9   should submit any proposed written *voir dire* questions.  If you

10   have not already filed those, I need those at least a week

11   before we start the trial.

12           We have jurors that complete questionnaires, and

13   those questionnaire responses are now available electronically.

14   Probably 10 days before the trial I think is usually when they

15   are available.  And you will get an electronic notice through

16   the CM/ECF system when those questionnaires are available for

17   you to access through CM/ECF.  So you don't have to check out

18   the questionnaires and come get physical copies and photocopy

19   them.  And you'll have them in advance of trial, not just on

20   the day of the trial.  So you'll get that notification, as I

21   say, through the CM/ECF system.

22           We have two conference rooms right outside the

23   hallway.  Each side will get a conference room to store some of

24   your stuff during the day.  And for any lawyers or witnesses

25   that don't want to or need to be in the courtroom, that would

1   be a place for them to congregate, for you to congregate during

2   lunch and breaks.  Those conference rooms will only be

3   available to you during the workday when the court security

4   officers are here, so any work that's done after 6:00, you need

5   to take that with you.  You won't be able to stay here and camp

6   out in the courthouse.  I think we open each day at 7:30.

7           COURT SECURITY OFFICER:  8:00.

8           THE COURT:  8:00.  The court security officers will

9   be downstairs to let you upstairs.

10          I guess we need to know how many — I guess from the

11  defendants, how many lawyers are actually going to need to be

12  there at defense table along with client representatives.  We

13  can bring in another table if you think that's necessary, or

14  not.  Looks like the one table will be plenty for the

15  plaintiff.

16          MR. CALLAHAN:  I think one table will be plenty.

17          THE COURT:  You think one table will be fine?  Okay.

18  Good.

19          I want to make sure that you familiarize yourself

20  with our courtroom technology before the trial.  We're not

21  going to have any orientations on our equipment during the

22  trial, so somebody needs to make arrangements before trial

23  to — with Mr. Gunn.  He's my courtroom deputy.  Ms. Long has

24  moved to another position.  She's still with the court.  But

25  this is Geoffery Gunn, who is the courtroom deputy, and you

 1    need to make arrangements with him to get a tutorial on the
 2    equipment before we start the trial.
 3            I think this type equipment is fairly standard now,
 4    at least within the federal system, but you still need to make
 5    sure that your laptops and your electronic devices sync up,
 6    probably, with the equipment.  We used to have a problem with
 7    some older computers not linking up properly without some
 8    special cord or something.  I think that's all been eliminated
 9    unless you have got an antique piece of equipment.  But we just
10    need to make sure all that's working.
11            We basically try these cases paperless.  I had a
12    two-week trial that just finished last week involving a
13    construction case that I think we had over 400 exhibits in that
14    case, and it was basically tried paperless.  You need to still
15    have your paper exhibits because when the jury is deliberating,
16    I do send those out with them.  But your computers ought to be
17    able to hook up with our system so that when you want to tender
18    an exhibit, you can pull it up on the system.  And before it's
19    admitted, it will come up just on my screen and the lawyers'
20    screens.  And then when it's admitted, it will come up on all
21    the jurors' screens so that you are not passing paper around to
22    them or having a hundred blowups; although if you want to have
23    blowups, you can have blowups.  But I think it works well.  The
24    jury has the monitors, and the exhibits are right there in
25    front of them.  The system has a feature where you can write on

 1   it with your finger and circle things in red or blue or

 2   whatever color you want.  And I'm sure your programs have

 3   features where you can pull out highlighted text and that type

 4   thing.  So if you try many cases in the federal courts, I'm

 5   sure this is no different or not much different than what you

 6   have seen before.

 7            The system also allows — when exhibits are admitted,

 8   allows them to be downloaded into a database so that at the end

 9   of the trial there is a jury — there's a monitor in the jury

10   room with a keyboard that allows the jury to click on exhibit

11   numbers and they show up on this big screen in the jury room,

12   so that if all the jurors want to look at the same exhibit or

13   document at the same time on the screen, they have the

14   capability of doing that.  But I also — just to be careful, I

15   send the actual paper exhibits up to the jury room also, so if

16   somebody wants to actually handle the paper, they can do that.

17   But in order for that system to work with the download of the

18   exhibits, we need to make sure that you provide us with the

19   proper disk — I don't know what they call them now; flash

20   drive or something — that's got the exhibits on it so that

21   when we admit it, we dump that exhibit into the admitted

22   database for the jury.  But Mr. Gunn — there should be

23   information on our pretrial order and on our Web site as to

24   what is required in that regard.  But we have that available.

25            If you still want to bring your tech person to set up

1    screens and all that kind of stuff, then go for it.  But you
2    need to make sure that that kind of equipment is compatible
3    with what we can accommodate.
4         Let's see.  I have avoided for 17 years — and I
5    think I have tried about as many jury trials as any federal
6    judges during that period.  And I have generally avoided this
7    very structured giving lawyers certain numbers of minutes on
8    examinations.  I have found that there are other ways that I
9    can encourage lawyers to not be duplicative.  And I have
10   avoided that, and I'm going to continue to avoid it.  But you
11   just need to understand that if things get duplicative, I'm
12   going to move you along.  We're not just going to hear the same
13   old stuff over and over.  So you need to have this streamlined.
14        It concerns me that it looks like this is going to be
15   another trial by deposition, which I absolutely hate and jurors
16   absolutely hate.  One of the most consistent comments I hear
17   from jurors when I kind of debrief them after a jury trial is
18   they just don't like these depositions.  They want to see — I
19   don't care if they are video and they look like some Hollywood
20   producer produced the video.  They want to see live people up
21   here so that they can see them and hear them and watch them.
22   And one of the reasons I don't like depositions is because,
23   them being canned, I find that they are usually much longer
24   than that witness's testimony would be live, because typically,
25   even if you are taking the deposition for use at trial, there's

1   nothing like what you think is important when you are in trial.

2   And I find that a lot of these depositions go over stuff that I

3   think the lawyers may think that shouldn't have been included.

4   It just doesn't add much to the whole thing.  But at that point

5   we've just got to sit there and listen to them drone on and on

6   and on.

7           But I understand that if a witness is unavailable,

8   then y'all can bring on these depositions.  But in looking at

9   the pretrial order, it just looks like we're going to have a TV

10  show here for a couple of weeks.  And I hope that's not — I

11  hope that's not the case.  And if it is the case, I hope

12  everybody goes back again and tries to make sure that the

13  depositions are edited as tightly as possible.  And I'm sure

14  they will be to some extent after we rule today on some motions

15  *in limine*.

16          I say I have no general time limits.  I do generally

17  expect that a cross-examination should be no longer than the

18  direct examination.  If a direct examination is an hour,

19  there's no reason for a cross-examination to be two hours

20  unless there's just some exceptional situation.  So I guess

21  that is somewhat of a principle that I try to follow, that your

22  cross-examination needs to be not only limited in scope subject

23  matter-wise to the direct but time-wise too.  Somebody puts up

24  a 20-minute witness, there ought not to be a 45-minute

25  cross-examination.  If you want to call that witness in your

 1   case in direct, then maybe so; although generally my approach
 2   to that has been if a party calls another witness as an adverse
 3   witness, somebody associated with your side, I generally give
 4   the party the opportunity to go ahead and question that witness
 5   then with their direct and then there will be a recross, or you
 6   can call them in your case, which means that they are going to
 7   get a shot at them again in cross in your case.  But I
 8   generally find that things move along better and smoothly and
 9   not really detrimentally to the party offering the witness if
10   we just get the witness out of the way that one time.
11            Now, if it ends up that the plaintiff is going to
12   call the adverse party to establish a couple of facts for 20
13   minutes, and then you want to do a direct examination that's
14   three and a half hours, then that may would be a circumstance
15   where I would say, no, you need to do that in your case.  But
16   if it's not going to be something like that, I would likely
17   give you the opportunity to conduct your direct of an adverse
18   witness and get it all taken care of at one time so that
19   witness can be done and the jury hears from them in one
20   setting.
21            With regard to depositions, we just need to put them
22   all — if you are going to play any of these depositions, the
23   whole thing is going to come in at one time.  I mean, we're not
24   going to play one part of it and then wait until the other case
25   and let — the other side's case and play the other part of it.

```
 1   If you are going to play these videos or read depositions, the
 2   whole thing that has been designated by plaintiff or defendant
 3   needs to just be done at one time.
 4            Okay.  Those, logistically, are the things I had on
 5   my list.
 6            I'm not a —— I'm not a real stickler for you being
 7   tied down to the lectern, as long as you don't abuse it.
 8   Cross-examination or other examinations, if you want to move
 9   around, that's fine with me.  The court reporter has a bigger
10   problem with that than I do, so she likes to insist that you
11   wear a lapel mic, which we have got available, as you move
12   around, if you are going to move off the microphones.  But I
13   don't have a problem with —— I don't see a need for you to be
14   necessarily tied down to that lectern.
15            The electronic equipment also has what they used to
16   call the Elmo feature.  So you can put a document down.  It's
17   on the side of —— I think they call it document cameras now.
18   But it also has that feature.
19            I would think that the opening statements in this
20   case certainly should not last more than an hour each.  So you
21   need to make sure you keep your opening statement under an
22   hour.
23            Cell phones and that type thing.  I do not have a
24   problem with you bringing a cell phone into the conference
25   room.  I don't really have a problem with you bringing it into
```

1    the courtroom if you turn it off and don't use it except for

2    this trial.  I don't want lawyers sitting back here, though,

3    either at that table or in the audience, with their cell phone

4    doing work on some other case or just checking their e-mails.

5    If your cell phone is critical to your presentation at trial,

6    then let the court security officers know and they will bring

7    it to my attention.  But I don't want to see people there

8    texting regularly while in trial.  It's just distracting for

9    the jury.  They are over there and figuring out what's this

10   person doing.  But if you want to bring them up so that you

11   have got them during breaks or whatever, you can bring them up

12   and have them in your conference room.

13            You obviously can bring the laptops or whatever

14   device you need to hook up to our computer; or if you have got

15   a iPad or whatever that you use for your witness examinations

16   or taking notes, whatever, obviously you can bring those, bring

17   those in.

18            I think that covers the logistical part of it.

19   Anybody have any questions about that, about how we're going to

20   run the trial?

21            Plaintiff?

22            MR. CHILDERS:  Your Honor, on the jury selection, do

23   you have an idea of how many jurors you are going to bring in

24   or how we're going to strike them in particular?

25            THE COURT:  We will — well, we're going to summons a

1    number, and we'll make a final decision on how many out of that
2    number we actually bring in.  But there will be a jury list
3    that each juror will have a number starting with one all the
4    way up to however many.  And they will keep that number
5    throughout *voir dire*.  That's how they will be identified.
6    They'll have a tag that has their juror number on it.
7              They will — all of them that we bring in for *voir*
8    *dire* will be seated out here in the audience in these benches,
9    starting with No. 1 over here on the first bench to your right,
10   to my left.  And they will snake down the first row all the way
11   over until we can't fit any more.  And then they'll go — I
12   don't know if the next number will start over here on the
13   second row or over here, probably over here.  But they will be
14   in sequential order with their number tags on.  And so when we
15   conduct *voir dire,* that's where they'll be.  They'll be out
16   there.
17             When we get to the point after we have taken all
18   excuses and requests for — or strikes for cause, and we're
19   down to the panel from which you'll exercise your peremptory
20   challenges, we will — since each side — I didn't say this.
21   But each side will have three peremptory challenges each.  So
22   the plaintiffs will have — plaintiff will have three
23   challenges peremptory and the defendant will have three.
24             So after we have excused everybody for cause that
25   needs to be excused for cause, we'll start with No. 1, or the

1  lowest number, whoever has not been excused, and we'll go with
2  the next 18.  And that will be the strike panel.  So it will be
3  1 through 18 if nobody 1 through 18 got struck for cause, or if
4  all jurors 1 through 18 showed up.  But it will start there
5  with 1.  We'll have a sheet, and it will have the first 18
6  jurors with their names and numbers.  And I do the silent
7  strike process where that sheet will be handed first to the
8  plaintiff, and the plaintiff will simply mark through your
9  first peremptory challenge on the sheet and put P 1 beside it.
10 And then the sheet will go to the defendant.  Then the
11 defendant will mark through their first peremptory challenge
12 and put D 1 beside it.  And then it will go back to the
13 plaintiff and back to the defendant and back to the plaintiff
14 and back to the defendant, so that we have got 12 jurors left.
15      You don't have to exercise all three of your
16 peremptory challenges.  If you choose not to exercise all of
17 them, then the jury will be the top 12 jurors starting at the
18 lowest number of persons who have not been stricken after every
19 side has exercised all of the peremptory challenges that they
20 wish to exercise.  So that's how that will work.
21      MR. CHILDERS:  Thank you, Your Honor.
22      THE COURT:  Yes, sir.
23      MR. CHILDERS:  I know you said obviously we can't
24 work in here in the evening.  Can we leave things in the
25 conference room?

1          THE COURT:  Yes, you can leave things in the
2    conference room.  You can leave them in the courtroom.  The
3    courtroom will be locked up when we adjourn each evening.
4          MR. CHILDERS:  As far as lawyer questions, will those
5    be to the panel or do you do individual *voir dire?*
6          THE COURT:  I do not do individual *voir dire* unless
7    it's follow-up *voir dire.*  Obviously there may be some
8    follow-up to a particular juror.  And if you note something in
9    the questionnaires of a particular juror and it does not get
10   covered by me in general *voir dire,* then I'll let you
11   individually *voir dire* that witness about that, assuming it's
12   relevant.
13         MR. CHILDERS:  Yes, Your Honor.
14         THE COURT:  All right.  Anything from the defendant?
15   Mr. Schmidt?
16         MR. SCHMIDT:  Yes, Your Honor.  I was just going to
17   ask on the thing that Your Honor said about cell phones, I
18   assume the same thing applies to laptops in the audience.  We
19   sometimes have people in the audience who will track on their
20   laptop but...
21         THE COURT:  As long as they are using them for this
22   case, that's fine with me.  I don't want a court security
23   officer come to me and say this lawyer is out there — I saw
24   him cruising Google or — it may be related to the case, but
25   they are reading the Wall Street Journal or something.  If they

 1   need it for this case, that will be fine.

 2             MR. SCHMIDT:  Understood.  Thank you.

 3             MR. CALLAHAN:  We have already submitted *voir dire*

 4   questions.  If we have objections to certain questions they

 5   have asked, when do we address those?

 6             THE COURT:  Whenever you want.  I don't usually pay

 7   much attention to them.  I can figure out pretty quickly

 8   whether a *voir dire* question is appropriate or not.  But

 9   everybody likes to file paperwork.  It doesn't matter.  Before

10   trial.  If you file it, I'll read it.  But I can tell you with

11   regard to *voir dire* questions, it's not that hard to determine

12   whether they are appropriate or not.

13             MR. CALLAHAN:  Will you supply the list of questions

14   you are going to ask before?

15             THE COURT:  No.  No.  Y'all give me enough stuff to

16   read before trial that I don't have time to do that.

17             MR. CALLAHAN:  Would now be the appropriate to

18   address two questions, or would you rather we wait until right

19   before trial?

20             THE COURT:  I'm curious now, so go ahead and tell me

21   what the big problem is with *voir dire* questions.

22             MR. CALLAHAN:  On plaintiff's *voir dire* Question

23   No. 42, they ask about press coverage in this case.  And there

24   really has not been any, and I think that question is going to

25   generate an opinion to this jury that this is a widely

1   publicized case.

2           THE COURT:  I will generally ask them whether they

3   know anything about it, whether they have heard anything about

4   it, whether they are familiar with anything.  And I may say,

5   "Have you heard anything in the press about it?"  But I'm going

6   to sufficiently question them to make sure that they either

7   know nothing about it, or, if they do, we find out what they do

8   know about it.  So I can't tell you right now whether I'm going

9   to for sure not ask them about press coverage or not.  I ask —

10  I sometimes ask about press coverage if there's a road wreck

11  right across from your office.  I'll ask them, "Anybody seen

12  anything on the news about this or know anything about it?"

13          MR. CALLAHAN:  I'm just afraid the question they have

14  asked is particularly this case, and there has been no press

15  coverage except for Mr. Childers' blog about this particular

16  case.  With regards to —

17          THE COURT:  The reason I conduct the *voir dire* is

18  because I think I'm less inclined to ask questions which are

19  inappropriately intending to sway the jury as opposed to elicit

20  information.  And I think I can pretty much figure that out

21  without —

22          MR. CALLAHAN:  I fully appreciate —

23          THE COURT:  I do not take the *voir dire* questions and

24  just mindlessly read them without thinking about whether they

25  are appropriate or not.

1          MR. CALLAHAN:  I understand.

2          Very, very briefly, Question 35 has to do with

3   whether or not jurors believe that a company has to duty to

4   fully test its products prior to selling them to the consumer.

5   That's not a part of this case.  I think they are trying to

6   introduce a theme or theory in the case that's not appropriate.

7          THE COURT:  Well, I can't guarantee you I will or

8   won't ask that.  Those are typically the types of questions I

9   typically do not ask.  I am relatively certain that at the

10  conclusion of my *voir dire* questions you will not think that I

11  have attempted in any way by the reading of the questions to do

12  anything other than elicit information that is going to be

13  valuable to you in striking the jury and not influencing the

14  jury in any way.

15         MR. CALLAHAN:  And the final issue, with regards to

16  what you have gone over already is right now we have 33

17  witnesses listed by the plaintiffs in this trial.  The number

18  of witnesses that they have listed is going to affect who we're

19  going to call as well.  We don't anticipate there's any chance

20  this case could be tried in two weeks with all of those

21  witnesses.  We're just asking the Court to maybe encourage them

22  to give us a more limited list of who they actually expect to

23  testify so we can pare and move this case along.

24         In the same regards, right now we have 33 hours of

25  deposition testimony that we expect is going to come in.  As

 1  you said just a second ago, Judge, a lot of these are going to
 2  involve treating physicians who are here in town who can be
 3  called live.  If they are going to be called live, we would
 4  like to know ahead of time so we can prepare.  And also we
 5  would need to take depositions again of those doctors to find
 6  out what other communications have taken place between the
 7  plaintiff's counsel and those doctors.  They would be very
 8  brief depositions.  But if we could get some sort of assurances
 9  from them who they are going to call and who they are
10  absolutely not going to call, it would help us.
11          THE COURT:  Well, I don't generally require lawyers
12  to reveal their trial strategy.  I encourage lawyers to do
13  whatever they can to make sure the trial goes smoothly and as
14  quickly as we can, without divulging their trial strategy.  I
15  would think the plaintiffs are as eager as the defendant to
16  make sure that a jury is not up there deliberating with
17  Christmas Eve hanging over their head.  I mean, regardless of
18  whether you think it puts them in the giving spirit or not, you
19  don't want them to have that extraneous factor out there when
20  they are trying to go through the evidence and decide what to
21  do.  So it seems to me that both sides would have proper
22  incentive to get this thing streamlined between now and the
23  date that we start the trial.  Y'all can work out narrowing
24  your list, then that would be great, but I just generally don't
25  order that —

```
 1              MR. CALLAHAN:  I understand.  But also ——
 2              THE COURT:  I just think good lawyers know how to
 3    handle those kind of things.  They don't need the judge to sit
 4    there and hold their hands.
 5              I mean, do y'all know —— I'm assuming, Mr. Childers,
 6    if you know of certain witnesses that you are definitely under
 7    no circumstances going to call, then you wouldn't mind they
 8    telling them that.
 9              MR. CHILDERS:  Yes, Your Honor.  I don't disagree
10    with that.  We actually have an agreement with them that we
11    notify them —— I believe it's ——
12              THE COURT:  Yeah, I thought I saw that, that y'all
13    had all these agreements about 36 hours and 24 hours.
14              MR. CHILDERS:  Yes, sir.  So we're telling them who
15    we're calling more than a day ahead of time.
16              THE COURT:  Right.
17              MR. CHILDERS:  And I can tell Your Honor, we just
18    tried another case in the Southern District of West Virginia
19    last month.  It took nine days of trial, not even nine days of
20    trial.  We had the same depositions that we used.  We limited
21    them.  We worked very hard together cooperatively to limit
22    them.  There's not going to be 30 hours of deposition testimony
23    played in this case, I promise you that.  But as far as the
24    witnesses we call live, some of that is out of our hands.
25    We're working as best we can to make sure that we keep it as
```

```
 1    tight and concise as we can, and we promise that we're not
 2    going to do anything to belabor the trial or make it go longer
 3    than it should be, and we're not going to try to be duplicative
 4    of anything.
 5              MR. CALLAHAN:  One of the issues that may prolong the
 6    case, they tell us 36 hours ahead of time they are going to
 7    call a doctor live who they have taken deposition testimony of,
 8    we would have to come to court to ask to take that deposition
 9    to find out about any other communications or developments,
10    because it's been three years since we have taken at least one
11    of these depositions.
12              THE COURT:  How is that different than if -- how is
13    that different than when you take the discovery deposition of
14    the witness and a treating doctor and then he comes in to
15    testify live?
16              MR. CALLAHAN:  If we know he's going to testify live,
17    we would take another deposition.  If the first deposition
18    occurred three years ago --
19              THE COURT:  Yeah, but didn't the deposition relate --
20    it's not a -- the guy died.  The patient died.  It's not a
21    continuing treatment thing.  So, I mean, I'm assuming if you
22    nailed him down in his deposition and said, "These are all the
23    opinions you have.  You don't have any other opinions," then if
24    he develops other opinions between the date of the deposition
25    and the time of trial, then they are under a duty to supplement
```

1  and let you know that.  And if they don't and he comes in and

2  he testifies to new opinions, then those new opinions would be

3  excluded.  I just don't see how it's any different —

4        MR. CALLAHAN:  The theories in this case have sort of

5  developed over the last three years, and these doctors weren't

6  asked certain questions.  It would be a very brief deposition

7  of simply, "Have you looked at any documents and have the

8  plaintiff's lawyers provided you anything or had any

9  communications with you?"

10        THE COURT:  So you do that in every case?  Every case

11  you have, when you take a deposition, say, six months before

12  the trial, you take a brand new deposition the day before the

13  trial?

14        MR. CALLAHAN:  If the doctor is going to testify

15  live, I have asked to take another, sometimes outside the

16  courtroom, just to see if anything new has developed.  The

17  thing we're most concerned —

18        THE COURT:  I think what you're entitled to is

19  reasonable supplementation if he's going to testify to anything

20  that he didn't — wasn't covered in the deposition.

21        MR. CALLAHAN:  Thank you, Your Honor.

22        THE COURT:  I'm not — I'm not going to stop in the

23  middle of trial and let depositions be taken, I can assure you

24  of that.  If there's some exceptional circumstance, then

25  perhaps y'all will spend your night doing it.  But it would

1    have to be an exceptional circumstance.

2             Now, if you know a month out that some doctor has

3    likely developed some additional opinions, or if they tell you

4    that he's going to testify to certain things in addition to

5    what was in his deposition and they supplement their responses,

6    then, sure, I think you can depose him.  But — how many times

7    has Dr. Darrah been deposed?  One time?

8             MR. CALLAHAN:  One time.

9             THE COURT:  Is that what we're talking about?

10   Dr. Darrah says in his deposition that if he had been told of

11   the 110 milligram dose, then he would have given him the 110

12   milligrams, or whatever he said; and now we have thrown that

13   claim out based on preemption.  And so if they put up his

14   deposition, I'm assuming your argument is going to be that's

15   the only testimony as to causation and they shouldn't be able

16   between now and trial to let him develop some new opinions that

17   he would not have given, that he would have done something

18   different —

19            MR. CALLAHAN:  That's exactly right.

20            THE COURT:  — outside of the 110 milligrams.  So, I

21   mean, my view would be, if he's going to come in here and give

22   some additional reasons that he would have not prescribed the

23   drug or that he — if he had known about a more robust warning,

24   that he would have given it at a lower dose, the 75 milligram

25   dose, that's something they need to supplement and tell you

1   he's going to have those opinions, then you ought be able to

2   depose him.  And I have not read his deposition in any detail.

3   But if his causation testimony is, "If they had told me that

4   110 milligram dose was available, I would have given that

5   dose," you are likely going to lose at directed verdict if

6   that's the only testimony on causation.  So I'm assuming that

7   you are going to try this case, he's going to say something in

8   addition to that, which is why I was a little surprised to see

9   what I thought was him listed only as testifying by deposition.

10              MR. CHILDERS:  He's not.

11              THE COURT:  Maybe I misread that.

12              MR. CHILDERS:  He's not just listed as deposition.  I

13   don't think any of the treating doctors —

14              THE COURT:  Is he going to give additional opinions

15   beyond what he did in his deposition?

16              MR. CHILDERS:  I don't know the answer to that, Your

17   Honor.  I haven't spoken to him.

18              THE COURT:  At all.

19              MR. CHILDERS:  Not since his deposition.

20              THE COURT:  Okay.

21              MR. CALLAHAN:  If he's going to represent they

22   haven't spoken to him, we don't need to take another

23   deposition.  But if he does speak with him, we would like to

24   follow up about that conversation.

25              MR. CHILDERS:  I understand that, Your Honor.

```
 1              THE COURT:  Okay.

 2              MR. CHILDERS:  Yeah.

 3              THE COURT:  All right.  Motions in limine.  I think

 4    the defendants requested oral argument on several of these, so

 5    I'll hear from Mr. Schmidt, Mr. Callahan, whoever wants to

 6    handle this, which ones you want to give oral argument on.

 7              MR. CALLAHAN:  Your Honor, before we start, yesterday

 8    we suggested — because there's quite a bit to go over today,

 9    we suggested an agenda and provided to plaintiffs that we

10    thought might expedite this hearing.  I didn't know if you

11    wanted to see that or if they have any objections to what we

12    suggested.  I know this is your courtroom.  We're not trying to

13    decide how it's —

14              THE COURT:  I'll be glad to look at it.

15              MR. CHILDERS:  We don't have any objection to it.  We

16    just assumed you would tell us how you wanted to run the

17    hearing.

18              THE COURT:  I will.

19              MR. CHILDERS:  Thank you, Your Honor.

20              MR. CALLAHAN:  And I'm not trying to suggest

21    otherwise.

22              THE COURT:  I have — I'll have this as my check

23    list.

24              As I said earlier, let's take up the defendant's

25    motions in limine that they wanted oral argument on.  Tell me
```

1  which they are, and I'll hear from you.

2       MR. SCHMIDT:  Your Honor, if I could start with our
3  first one.

4       THE COURT:  Yes, sir.

5       MR. SCHMIDT:  Probably makes sense to start with the
6  110 milligram dose motion, which picks up off of Your Honor's
7  comments.

8       May I speak from the lectern?

9       THE COURT:  Yes, sir.

10       MR. SCHMIDT:  Thank you, sir.

11       I think our 110 milligram argument is pretty straight
12  forward, and it's based on Your Honor's pretrial ruling on
13  preemption.  Your Honor specifically preempted the claim.  This
14  is from Your Honor's summary judgment's motion.

15       THE COURT:  Before you get into that -- I don't think
16  this is on your agenda, but it was on my notes.  And it's not
17  really relevant, I don't guess, other than there has been a
18  couple of things that have been said tangentially in some of
19  the filings.

20       This case, as I understand it, was not in the MDL
21  either originally or as a tag-along.  Is that correct?

22       MR. SCHMIDT:  Yeah.  It came in just too late, Your
23  Honor.

24       THE COURT:  So the settlement -- the settlement as
25  part of the MDL had already been consummated without this case

 1  being part of it.

 2              MR. SCHMIDT:  I think that's right, Your Honor.

 3  Mr. Childers can correct me if I'm wrong.  But my understanding

 4  is the case was filed after the settlement and was not subject

 5  to the settlement.  I don't have the exact timing of the

 6  filing, but it was not subject to the settlement.

 7              THE COURT:  Okay.  Were you involved in the MDL?

 8              MR. SCHMIDT:  Yes, I was, Your Honor.

 9              THE COURT:  So how many claims were settled as part

10  of the MDL settlement?

11              MR. SCHMIDT:  It was about 5,000, close to 5,000,

12  just under.

13              THE COURT:  And the settlement, the MDL settlement,

14  how did it tie down the participants?  In other words, did they

15  all end up having to — obviously they all eventually ended up

16  having to agree, but I guess you settled it on representations

17  that was agreeable to counsel?

18              MR. SCHMIDT:  Yes, Your Honor.  There were a couple

19  of requirements.  Basically there was a set dollar amount, and

20  then the money paid out would be allocated among the claimants

21  based on criteria that they met, in terms of how severe their

22  injury was.  And there were requirements both that there be a

23  certain level of participation by the claimants — it ended up

24  being much higher than anticipated — and there was a

25  requirement about cases going forward in terms of a procedural

1  requirement that applied in the then-MDL and that applied in
2  some of the state court jurisdictions about future filings.
3          THE COURT:  So you ended up having — there were more
4  people that wanted to participate than was expected.
5          MR. SCHMIDT:  Yes.  But the way the settlement was
6  set up was that didn't change the dollar amount.  That changed
7  the allocation.
8          THE COURT:  So each person got less than they
9  otherwise would have.
10         MR. SCHMIDT:  Yes.  Correct.
11         THE COURT:  When they learned of that, did they have
12 the opportunity to opt out?
13         MR. SCHMIDT:  They had the opportunity, I think, if I
14 remember the language, not to participate.  But that didn't
15 prove to be an issue.  If they didn't participate, they had to
16 meet certain procedural requirements going forward.  And I
17 think those procedural —
18         THE COURT:  This case is completely outside of that.
19 This case was — number one, it wasn't a tag-along or in the
20 original MDL; and, two, these people didn't apply to become
21 part of the settlement.
22         MR. SCHMIDT:  I don't think they could have.  They
23 were precluded from doing so under the terms of the agreement
24 and the timing of the case.
25         THE COURT:  So the only relationship between this and

 1     the MDL is the agreement to use the MDL discovery as part of
 2     this case?
 3               MR. SCHMIDT:  Yes, Your Honor.
 4               THE COURT:  Okay.  Go ahead.
 5               MR. SCHMIDT:  So on the 110 issue, Your Honor, the
 6     claim that Your Honor held preempted, at page 11, Docket 44, of
 7     the summary judgment motion is the claim that Boehringer should
 8     have instructed physicians to prescribe a 110 milligram dose
 9     Pradaxa in certain circumstances.  And that's really the focus
10     of our motion.
11               We have had the experience —— we have had a few
12     trials now, different jurisdictions.  And in the first trial
13     that occurred, the first Pradaxa trial earlier this year in
14     Connecticut, in our view, Your Honor was the first to enter
15     this preemption ruling.  Other courts followed suit.  Every
16     court that has considered this preemption issue has found a 110
17     claim to be preempted.  But in the first trial that we had in
18     Connecticut state court, the plaintiffs, we believe, evaded a
19     similar preemption ruling by using 110 evidence to argue that
20     the 150 dose was too high.  And basically what they did was ——
21               The 110 issue is pretty unique to the United States
22     in that in almost every other jurisdiction around the world,
23     the 110 milligram dose has been approved.  It's only in the
24     United States that it hasn't been, because the FDA went a
25     different direction.  And they actually published an article

1   explaining why they went in a different direction.  And so in
2   other countries in the world, Boehringer gives guidance to
3   doctors, to say, "Here is where you might want to consider the
4   110.  Here is where you might want to consider the 150."
5           In the first trial we had, the plaintiff lawyers used
6   those documents to say, "Well, those documents are admissions
7   that you believe 150 is too much for certain patients," even
8   though all those documents are doing is saying when you have
9   both doses available, here are circumstances where you should
10  or you might want to consider the 110 versus the 150.
11          In a more recent Connecticut trial, one just a month
12  or so ago, the Court actually took the opposite view and said
13  if you can't bring that kind of 110 claim directly, you can't
14  do it indirectly by using documents that talk about when to use
15  the 110 and when to use the 150 in order to make a preemption
16  claim.  I think the language of the Court was — of the
17  Connecticut court that we cited in our reply brief — was
18  exactly that, that you can't do indirectly what you can do
19  directly.  And that's essentially the essence of what they are
20  trying to do with these arguments.
21          And I'll give you just one example, if I may, Your
22  Honor.  One of the documents that is cited is Exhibit 2 to the
23  plaintiff's opposition on this motion.  It's a document — it's
24  a company document called the "Company Core Data Sheet," which
25  is essentially internal labeling for the company that's

 1    supposed to influence what happens in different countries.  And
 2    it's written with the idea that the 110 milligram dose is
 3    approved.  And statements that they want to use to make this
 4    argument that the 150 dose is too much — this is page 6 of the
 5    document, Exhibit 2 to plaintiff's opposition — are statements
 6    like:  "For patients with one or more of these risk factors" —
 7    risk factors for bleeding — "a reduced daily dose of 220
 8    milligrams, given as 110 milligram twice daily, may be
 9    considered at the discretion of the physician."  And they want
10    to use that to say, we believe falsely, that that reflects a
11    company conclusion that for those patients who have those risk
12    factors, 150 milligrams is too much.  That's not accurate.  If
13    they had a document that said patients in certain groups should
14    never use the 150, without reference to the 110, we would not
15    be challenging that.  That would be subject to any other
16    evidentiary objections.  That would be admissible.  They don't
17    have that document.  So what they are trying to do is take
18    documents that compare the two doses and that say, here is
19    where one dose is appropriate and here is where the other dose
20    is appropriate, and use that to say the 150 is too much.  And
21    in our view that runs directly contrary to Your Honor's
22    preemption ruling.
23              THE COURT:  Tell me why your folks can't explain that
24    "In a world where 110 is an option, we would suggest it being
25    used under certain circumstances.  But the FDA in the United

1   States does not allow us to use the 110, and the only options

2   under the FDA are 150 and 75.  And we think if that is the

3   choice, then the 150 is more appropriate than the 75 due to the

4   fact that it has better stroke-reducing qualities that

5   substantially outweigh the increased bleed risk."

6            MR. SCHMIDT:  Well —

7            THE COURT:  I mean, my concern is once we start just

8   picking and choosing what parts of what you knew a jury should

9   hear, then they don't really get to the full truth of the

10  matter, because I'm assuming what I have just suggested is what

11  your folks would say.

12           MR. SCHMIDT:  Yes.

13           THE COURT:  Or something along those lines.  And if

14  I'm assuming that a jury can figure that out, then why

15  shouldn't they hear that?

16           MR. SCHMIDT:  Well, I think that's a perfect

17  question, and it's exactly what we faced in this first

18  Connecticut trial where this evidence came in, as opposed to

19  most recent one where it was kept out.

20           THE COURT:  They would clearly be instructed with

21  some type of limiting instruction — I know some lawyers don't

22  think that will do any good — but some type of limiting

23  instruction that would say you can't hold them responsible for

24  not recommending the 110 milligram dose.  And, in fact, they

25  should be told that the reason you can't is the FDA has told

1  them they can't offer a 110 milligram dose.  But to preclude

2  the plaintiff from putting up any evidence that suggests that

3  they knew that 150 milligram dose may be too much in certain

4  patients simply because that evidence may in part be based upon

5  a reference to the 110 milligram dose seems to kind of be an

6  all-or-nothing thing.  And I know you say that that was the

7  approach taken in the most recent case, but that clearly

8  excludes relevant evidence potentially.

9          MR. SCHMIDT:  Yeah, and that's, I think --

10         THE COURT:  I guess would be excluded under 403.  And

11  under 403, its probative value has to be substantially

12  outweighed by these other factors.  And I guess, depending on

13  what the evidence is, it could have --

14         MR. SCHMIDT:  Well --

15         THE COURT:  -- significant probative value.  And it

16  would be hard to say that it's substantially outweighed by

17  unfair prejudice or confusion with the appropriate limiting

18  instruction.

19         But I see your argument.  And I can see some evidence

20  that references the 110 may be inappropriate.  But to just have

21  a blanket *in limine* ruling that there can be no reference

22  whatsoever to the 110, I think that's -- we're kind of cutting

23  with a meat cleaver instead of trying to precisely decide.

24         Let me ask the plaintiffs.  I probably should have

25  done this first.  This may have been on Mr. Callahan's agenda.

```
 1   No, don't see it.
 2            Just so we're all on the same page —— because I'm not
 3   sure we are.  I think I'm on the same page.  I know I'm on the
 4   same page with myself.  But what does the plaintiff, after my
 5   rulings, understand the claims are that we're going to try?
 6            MR. CHILDERS:  My ——
 7            THE COURT:  I think this is important to nail this
 8   down so we can determine whether the evidence is probative or
 9   not.  What is it that you think we're going to try?
10            MR. CHILDERS:  My understanding is that we're going
11   to try failure to warn claims, which would be strict liability
12   and negligent failure to warn, and that we're going to try
13   design defect claims solely based on lack of adequate warnings,
14   same thing, strict liability/negligence.
15            THE COURT:  Explain to me the difference between a
16   strict —— under Georgia law —— a —— I understand the negligent
17   failure to warn claim.  I understand that.  What is the
18   difference under Georgia law between a, quote, strict liability
19   failure to warn claim and a defective design failure to warn
20   claim?  What's the difference in those two claims?  When you
21   speak of strict liability, you are talking about the Georgia
22   defective product statute, or is there another Georgia statute
23   that relates to failure to warn?
24            MR. CHILDERS:  I'm not aware of another statute.
25            THE COURT:  You are talking about 51—111, or what's
```

1    the statute?

2            MR. CHILDERS:  I wish I could quote it off the top of

3    my head.

4            THE COURT:  When you are talking about strict

5    liability, you are talking about statutory strict liability

6    under the Georgia statute.

7            MR. CHILDERS:  Yes, sir, as interpreted by the cases

8    as well.

9            THE COURT:  Right.  Where the — you have to prove

10   that the product was not reasonably suited for the use

11   intended, which generally means you prove that the product was

12   defective.  And I had always understood — and this is what I

13   want you to explain to me because this is where I'm a little

14   confused — is that under that strict liability statute, you

15   could have a defective product case based upon there being a

16   manufacturing defect, a defect in the manufacturing process —

17   which doesn't apply here — or you could have a defective

18   product case based on the product being defectively designed;

19   and within that subset of cases, you could have a defective

20   product that was defectively designed due to the inadequate

21   warning.  And in that case, you would apply the various factors

22   as to whether the product was defective due to the inadequacy

23   of the warning.

24           Is there another — is that your design defect claim

25   relating to the warning, what I have just described?

1          MR. CHILDERS:  Yes, sir.  Based on your rulings, that
2    is the claim that we understand we can still bring.
3          THE COURT:  What is this third claim that is — you
4    said a strict liability failure to warn claim, and then you
5    said a design defect failure to warn claim.  What's the
6    difference in those two?  Aren't they the same thing?
7          MR. CHILDERS:  I'll do my best to explain, because I
8    have had trouble myself at times trying to understand.
9          My understanding is that the failure to warn claim
10   requires that, in this case because it's a prescription
11   product, a learned intermediary had to not be warned and
12   couldn't have known about the existence of these side effects
13   in any other manner.  So under the Georgia case law, if the
14   doctor already knew about the side effects, even though the
15   label didn't include them, we wouldn't have a proper failure to
16   warn claim.  With the design defect, my understanding is it
17   really —
18          THE COURT:  You wouldn't have a failure to warn claim
19   under a negligence theory?
20          MR. CHILDERS:  Correct.  And then my understanding
21   with the design defect is it somewhat takes out the physician
22   from the equation to decide was the product adequately labeled
23   as it left the manufacturer's facility or what-have-you.  And
24   so that the level of proof that you have to prove for a design
25   defect claim is different than the failure to warn claim here

1    because we're dealing with a prescription drug.  That's how I

2    have understood it, the differences.

3           THE COURT:  All right.  I don't know that I agree

4    with that or not, but I'm with you.

5           So what's this third claim?  When you were saying —

6    when you were saying strict liability failure to warn and then

7    you also said design defect failure to warn claim, were you

8    meaning those two are the same things?

9           MR. CHILDERS:  No, sir.

10          THE COURT:  Are there three claims you think you are

11   asserting or two?

12          MR. CHILDERS:  Well, I think there are —

13          THE COURT:  Causes of action.  Are you asserting —

14   after my summary judgment order, how many causes of action do

15   you think you are asserting relating to the failure to warn?

16   Two or three?

17          MR. CHILDERS:  You are not going to like my answer.

18   I believe it's four because we have strict liability for each

19   one and negligence for each one.  So I think those — there's a

20   separate level of proof.  The negligence looks at the conduct

21   of the company, whereas the strict liability doesn't.  And I

22   think the way that you ruled, my understanding was all failure

23   to warn claims were available to the plaintiff to pursue, and

24   then on your reconsideration ruling, that the design defect

25   based on inadequate warnings was also appropriate for the

```
 1   plaintiff to pursue.
 2             THE COURT:  You think you have got a negligent
 3   failure to warn —
 4             MR. CHILDERS:  Yes, sir.
 5             THE COURT:  — claim, a negligent design claim based
 6   upon an inadequate warning claim —
 7             MR. CHILDERS:  Yes, sir.
 8             THE COURT:  — a strict liability design defect claim
 9   based upon a inadequate warning.  And what's the fourth —
10             MR. CHILDERS:  I guess —
11             THE COURT:  — product liability strict liability
12   claim you got?
13             MR. CHILDERS:  I think you are looking at those as
14   the same.  And I don't necessarily disagree with that.  In my
15   mind I always sort of separate negligence from strict
16   liability.  But the third claim that you just described I think
17   is probably the only strict liability pursuit there.  So I
18   just — that's how I think of them, Your Honor, but I
19   understand exactly what you are saying.
20             THE COURT:  Okay.  Well, I thought what I was finding
21   in the order after the reconsideration was that you had a
22   negligent failure to warn claim and that you had a strict
23   liability statutory design defect claim but only as the defect
24   related to the warning.  I don't think I knew or had thought
25   that you were also asserting a negligent design claim due to an
```

1  inadequate warning.  How would that — I see potentially.  I
2  mean, theoretically — I haven't researched it.  But I see
3  theoretically how perhaps the strict liability design defect
4  claim relating to an inadequate warning could be different than
5  a negligent failure to warn claim, maybe.  I'm not real sure
6  how the negligent failure to warn claim could be different than
7  the negligent design claim relating to the inadequate warning.
8  How would those two — wouldn't the same rule with regard to
9  whether the doctor knew about it — wouldn't that apply
10 regardless on both your negligence claims?  I mean, if the main
11 difference — the main motivating reason for having the
12 difference is you think the strict liability claim you may not
13 have to be subject to that rule about whether the doctor knew
14 about the risk.  But that rule would apply to both negligence
15 claims, wouldn't it?
16         MR. CHILDERS:  I guess it probably would, Your Honor.
17         THE COURT:  Yeah.  So why don't we just —
18         MR. CHILDERS:  That's fine.
19         THE COURT:  There's enough to confuse the jury
20 already.  Why don't we just try the negligent failure to warn
21 and the strict liability design defect based on the inadequate
22 warning.  Why not just try those two claims.  I know you want
23 to try the others, but I already threw those out.  But don't —
24 doesn't that cover it?  You are going to get nothing — I know
25 lawyers don't want to give up stuff, but...

```
 1            MR. CHILDERS:  No.  I mean, I think that does —
 2            THE COURT:  That's what my order was.  Unless you
 3    file another motion for reconsideration —
 4            MR. CHILDERS:  No, sir.
 5            THE COURT:  — that wants to add a negligent design
 6    claim based on inadequate warning, what we're going to try is
 7    negligent failure to warn and the strict liability design
 8    defect claim relating to the inadequate warning.
 9            MR. CHILDERS:  Understood.
10            THE COURT:  I saw something in somebody's paperwork
11    they think Georgia doesn't recognize a strict liability failure
12    to design — strict liability product defect claim, product
13    design defect claim relating to inadequate labeling.  I think
14    there's case law that clearly recognizes that claim in Georgia.
15    But if somebody has something to the contrary, I'll be glad to
16    consider it.
17            MR. SCHMIDT:  Yeah.  I would like to go back and look
18    at the distinction between those two claims that Mr. Childers
19    just argued.  It's our view — we have the same understanding
20    of Your Honor's ruling that Your Honor expressed that it left
21    two claims.  It's our view that those are actually functionally
22    the same claim, and we're always concerned about jury confusion
23    when you're —
24            THE COURT:  So you are not suggesting that Georgia
25    has not recognized a strict liability product design defect
```

1   claim relating to inadequate labels.  You are just suggesting
2   that you think the elements of proof are the same for the
3   negligence claim.

4           MR. SCHMIDT:  Yes, Your Honor.

5           THE COURT:  Are you aware — I sort of thought that
6   myself, but I hadn't considered this position that Mr. Childers
7   has just enunciated.

8           Have you heard that?

9           MR. SCHMIDT:  No, I haven't.  And I don't think it
10  stands, because there's always a requirement on these types of
11  claims of both medical causation and what I think as warnings
12  causation or proximate causation.  And what he just described,
13  as I understand it, would read out the requirement of proximate
14  causation, because a doctor could have full knowledge, even
15  without the warning, which is a proximate causation bar.  And
16  that would be, as I understood the articulation of the claim,
17  that would be irrelevant.  I don't think that's right.

18          THE COURT:  Okay.  Well, I guess we'll flesh that out
19  between now and December 3rd as to what the difference in the
20  two claims is.  But what we're trying at the moment are those
21  two claims.

22          Now, I am not finding at the moment that the issue
23  about the doctor and proximate cause is any different between
24  the two.  But it would be helpful for you to file a short brief
25  in support of your position about how these two claims are

 1  different and let the other side respond before we start the
 2  trial.
 3          MR. CHILDERS:  Your Honor, the two claims you are
 4  speaking of is the negligent failure to warn and the strict
 5  liability design defect?
 6          THE WITNESS:  Yes.
 7          MR. CHILDERS:  I'm sorry.  I can articulate for you
 8  now why I think those are different.
 9          The negligence requires a look at what the behavior
10  of the company and the actions of the company were, whereas the
11  strict liability claim does not.  So those I think are clearly
12  separate.
13          THE COURT:  I guess what I was focused in on was your
14  distinction with regard to the doctor — if the doctor knows of
15  the risks, on the negligence claim, then there's — it doesn't
16  matter what you told them.  There's no proximate causation
17  because he already knew what you think he should have known.
18  But I thought you suggested that in the strict product
19  liability case even if he knew of those risks that you claim
20  should have been in the warning and their absence makes the
21  product defective from a design standpoint, I thought your
22  contention was going to be that that was a difference between
23  the negligence claim and product liability.  If that's going to
24  be your contention —
25          MR. CHILDERS:  That's not, Your Honor.  I'm sorry.  I

1  misspoke.  I apologize.  I apologize.

2          THE COURT:  All right.  And plaintiff's lawyers do

3  this all the time.  They pursue these negligence claims and

4  strict liability claims, at least under Georgia law.  And your

5  position is because the elements are different —— in one you

6  have got to prove that they didn't act as a reasonably prudent

7  manufacturer under similar circumstances, and in product

8  liability, even if it's based on a failure to warn, inadequate

9  warning, you lump that in with all the other factors and do the

10  risk utility factors in light of the warning, which may come

11  out to be the same result or not.

12          MR. CHILDERS:  It may be, but I think the elements

13  are different.

14          THE COURT:  But the elements are a little different.

15          MR. CHILDERS:  And I understand the ——

16          THE COURT:  Okay.  I'm not going to eliminate it at

17  this point just because they are the same.  I would consider

18  eliminating it if you had some Georgia case law that says

19  Georgia does not recognize a strict liability design defect

20  claim relating to warning labels.  And I don't think that's the

21  law.  I think Georgia does.  And I think there's a Georgia case

22  that has in fact said the two are different claims.  I think

23  the law says what Mr. Childers says the law is.

24          So he's not taking that other position, so we don't

25  need to chase that rabbit.

```
1              MR. SCHMIDT:  Okay.

2              THE COURT:  Okay.  Getting back to the 110.

3              MR. SCHMIDT:  Yes, Your Honor.

4              THE COURT:  Mr. Childers, do you have evidence which

5    you contend shows that they had serious concerns about the 150

6    dose and that they should have warned about those concerns and

7    that evidence does relate in some way to the 110?

8              MR. CHILDERS:  Yes, sir.

9              THE COURT:  Just briefly summarize what you have in

10   that regard.

11             MR. CHILDERS:  Sure.  Well, in particular —— and this

12   will go towards another motion in limine that I understand they

13   want to argue today, too —— is that in the rest of the world,

14   where the 110 dose is available, the company tells physicians

15   that patients like Mr. Chambers who are over 80 should not get

16   the 150 milligram dose.  There's no discretion for the doctor.

17   They don't give any discretion to the doctor.  They say that

18   dose is too high for an 80-year-old.  The labels outside of the

19   U.S. also say that if a patient has moderate renal

20   impairment —— which Mr. Chambers did —— if they are over 75 ——

21   which clearly he was since he was over 80 —— if they are taking

22   other medications that may interact with Pradaxa, then what the

23   doctors should do is give the patient a blood test and see if

24   their Pradaxa level is over a certain amount; and if it is,

25   that means the patient is at an increased bleed risk.  And then
```

1   it's up to the doctor to decide, do I give them a lower dose or
2   give them another medicine.  The argument —— and so we believe
3   that evidence is relevant.
4           THE COURT:  So you think the evidence is going to
5   show that Boehringer has developed this same exact drug, albeit
6   in Europe or where ever; and because of concerns of the 150
7   milligram dose, they have sought to have a 110 milligram dose
8   and it has been approved in those other countries; and the
9   reason for the concern is that people in this risk category
10  that you claim your client is in — or your client's deceased
11  father —— is that there's a higher risk of a bleed; and so if
12  they are in that category, the doctor should do some additional
13  testing ——
14          MR. CHILDERS:  Correct.
15          THE COURT:  —— to determine whether the 110 dose is
16  appropriate there.  But your argument would be that in the
17  United States should do the additional testing to determine
18  whether to do the 75 dose or the 150 or not at all.
19          MR. CHILDERS:  That's correct, Your Honor.  And I
20  think it's important to ——
21          THE COURT:  You think that the label does not
22  adequately raise that concern for a doctor.
23          MR. CHILDERS:  Correct.  The label in the United
24  States tells them they don't need to check a patient's blood
25  level, whereas the label in the rest of the world says these

1  patients ——

2          THE COURT:  Mr. Schmidt, I get back to my original

3  thought on it.  Why can't your folks just explain that?  I

4  mean, I don't blame you.  I would want to keep —— I mean, you

5  did a fairly masterful job keeping it out altogether in your

6  most recent trial.  Did y'all get a defendant's verdict in that

7  case?

8          MR. SCHMIDT:  We got a defendant's verdict in both

9  the first trial and the third trial.

10          THE COURT:  Oh, you did?

11          MR. SCHMIDT:  Yes.

12          THE COURT:  So it's not as prejudicial as you think.

13          MR. SCHMIDT:  Well, it is ——

14          THE COURT:  The folks in the first trial explained

15  what it all meant, I guess, and then you had a limiting

16  instruction.

17          MR. SCHMIDT:  We had a limiting instruction the first

18  trial.  But I have been waiting patiently to respond to Your

19  Honor's questions and have a few things I would love to say in

20  response to it.

21          The first is we're not seeking a blanket ruling.

22  There are all kinds of documents that talk about the 110,

23  studies, et cetera.  We're not trying to keep those out.  What

24  we're focused on are things that specifically compare the 150

25  and the 110 and say here is where you should use the 110 in

1    place of the 150, because that's just an argument that we

2    should have gotten the 110 approved in our view.

3            I'll give Your Honor just two examples, including one

4    that I believe Mr. Childers referenced.

5            The first is, for patients –– the Company Core Data

6    Sheet, Exhibit 2 to their opposition.  "For patients with one

7    or more of these risk factors, a reduced daily dose of 220

8    milligrams given as 110 milligram twice daily may be

9    considered."  That's the 110 argument.  That's an argument for

10   something that's not approved in the United States.  And in our

11   view, that actually doesn't have any relevance.

12           THE COURT:  But they are not going to be permitted to

13   argue that they should have given a 110, and you are going to

14   be permitted to tell them that in the United States they were

15   prohibited from giving a 110 because the Federal Drug

16   Administration told them that.  And I may tell them that in a

17   limiting instruction.  So the jury should be disabused of any

18   notion that they should have given a 110.  But what the jury

19   needs to know is whether there should have been a more robust

20   warning so the doctor would have known about these concerns and

21   decided whether it should be 75 or nothing.  And I think you

22   can –– your folks can explain that this is apples to oranges,

23   which it seems like that's your argument.  The fact that they

24   went through that analysis to get to the 110 is different than

25   them saying that the 150 is unsafe.  Just because they had a

1    110 option, it required a different analysis on their part.

2           MR. SCHMIDT:  But that's what makes it irrelevant, is

3    the only relevance of these documents —— and I'll read from

4    another, the document Mr. Childers ——

5           THE COURT:  Even if you did not refer to 110 —— let's

6    say the 110 is out of the picture.  But let's say that the

7    research revealed that We've got concerns about the 150 in

8    certain patients.  And let's say that the company said, And we

9    would like to get an intermediate dose to address those

10   concerns and that those concerns are one, two, three.  And they

11   don't get the intermediate dose.  But they don't, allegedly,

12   adequately tell the doctor about concerns one, two, three that

13   gave them concern about trying to seek an intermediate dose.

14   Particularly on a negligent claim, I'm wary about not letting

15   the jury hear that and make a decision on their own.  And the

16   mere fact that it's tied to 110 as opposed to some more general

17   intermediate dose language doesn't seem to me to make much

18   difference.

19          MR. SCHMIDT:  Two things on that, Your Honor.  The

20   first is, if there were documents that just talked about those

21   kind of concerns regarding the 150 that said this is too much,

22   that would be relevant.  We don't think those documents exist.

23   The only thing that exists is the company trying to say where

24   we have both doses, here is where you should look at one, here

25   is where you should look at the other.  And that we think is

 1   out under preemption.  It's not relevant in light of Your

 2   Honor's ruling.

 3           The second concern —— and it goes to Your Honor's

 4   point about the limiting instruction ——

 5           THE COURT:  Did the first court that let it all in,

 6   did they also find the 110 —— that the 110 dose claim was

 7   preempted?

 8           MR. SCHMIDT:  Yes, Your Honor.

 9           THE COURT:  Okay.

10           MR. SCHMIDT:  But that leads to the problem we had in

11   that first trial, which is if we're in a world where we're

12   trying to explain to the jury why these documents say this and

13   why they don't say this in the United States —— and I'll give

14   concrete examples.  Some of this labeling language we actually

15   submitted to the FDA saying approve the 110 and use this very

16   same language that's used in Europe or that's used in our

17   internal documents, and the FDA sent it out stricken through.

18   We're then litigating why the FDA didn't approve the 110.

19           And that's what happened in the first trial.  We were

20   constantly battling throughout the trial, at side bar and

21   everything, trying to set limits on —— we have to be able to

22   explain if they can use these documents.  Preemption applies

23   even if we don't make a lick of effort to get the FDA to

24   approve the 110.

25           In this case we did.  We made a lot of effort to get

1  the FDA to approve the 110, including giving the FDA documents

2  discussing the 110 in actual labeling requests to modify the

3  label to provide some of these very warnings that they say we

4  gave in Europe or we gave internally that we didn't give in the

5  United States.  And the FDA said no.  We're suddenly in a world

6  where we're litigating that question where, at least as we saw

7  in the first —

8           THE COURT:  Isn't that relevant as to whether you

9  acted as a reasonably prudent drug manufacturer?  I would think

10  the evidence that you tried to do those things would be

11  evidence of your prudence.  The FDA stopped you from doing it.

12           MR. SCHMIDT:  Not under the constitution, because

13  that's the essence of the preemption claim is you can't —

14  because their response is to say, well, you could have tried

15  harder, and they told you there was a hypothetical study you

16  could do, and if you would have done that hypothetical study —

17  even though our witnesses thought it was not feasible — then

18  maybe you could have gotten the 110 approved.  And suddenly

19  we're having to fight over a claim that even if we wouldn't

20  have made a lick of effort, it would be preempted.  We did make

21  effort on the very points that they are criticizing us for.

22  And suddenly we're having to fight over whether our effort was

23  good enough.

24           THE COURT:  But isn't their claim that — it's not

25  that you were negligent in failing to more actively pursue the

1   110 dosage.  That's not their claim, and the jury will be told

2   there's no claim for that.  But the claim is, based on what you

3   knew, which motivated you to consider a intermediate dose,

4   based on what you knew — we know you couldn't do the 110, but

5   you should have at a minimum warned — given more robust

6   warning in a jurisdiction where you can't do the intermediate

7   dose.  And then we don't get into litigating whether you were

8   reasonable or not in pursuing the 110.  The evidence only comes

9   in to show your knowledge or lack of knowledge of the risk.

10  And then whether you were reasonable or not is whether you were

11  reasonable in not addressing that in a more robust label.

12          MR. SCHMIDT:  I think —

13          THE COURT:  Go ahead.

14          MR. SCHMIDT:  I think that might be an issue if we

15  didn't have warnings in the United States.  But we do.  And let

16  me take one example, the age issue.  In Europe it says if a

17  patient is over 80, use the 110 in place of the 150.  In the

18  U.S. there is no 110.  So that warning doesn't appear in the

19  U.S. label.  Instead, what the U.S. label says in a couple of

20  places is the risk increases with age, it communicates what's

21  communicated in Europe, the risk is greater over the age of 75.

22  And there's specific — if I recall correctly, there's specific

23  data given on that point.  So there's a warning in the United

24  States about the risk of age.  There's a warning that directly

25  covers the plaintiff in this case because, of course, he was

1    over the age of 75.

2              THE COURT:  Maybe that's why you got a defendant's

3    verdict, and maybe that's why you'll get one here.  But why

4    should they be prevented from trying to convince the jury

5    otherwise?

6              MR. SCHMIDT:  Because the thing they're trying to

7    convince the jury is by saying because you could do something

8    in Europe that by law you can't do in the United States,

9    somehow your warning was defective.

10             THE COURT:  You are going to assume the jury is going

11   to ignore and not be able to comprehend my limiting

12   instruction.  Because if I tell the jury that you cannot find

13   against the defendant for its failure to recommend a 110

14   milligram dose, because the FDA prevented them from doing so,

15   then I'm going to assume they are going to follow that

16   instruction.  And Mr. Childers or Mr. Branch aren't going to be

17   able to argue to the contrary in their closing argument.  But

18   my concern is that preventing them from arguing that you were

19   aware of the risk of the 150 to the extent you had sought an

20   intermediate dose and that you knew how to warn more robustly,

21   perhaps — that would be a fact question — than you did, seems

22   to me to be more than marginally probative.

23             MR. SCHMIDT:  Two things on that.

24             THE COURT:  And I don't see how that probative value

25   is substantially outweighed by unfair prejudice or confusing

1  the issues.

2        MR. SCHMIDT:  Just so I say it so Your Honor has the

3  full context.  In the first trial the jury were given three or

4  four different questions:  failure to warn, the equivalent of

5  proximate causation, the equivalent of medical causation.  They

6  found a failure to warn in that case.  And I think it was

7  probably driven by this issue, by confusion over this issue.

8  And they didn't find causation in that case.  And that's was

9  why it was a defense verdict in that case.  I just want to make

10  sure —

11        THE COURT:  Well, my ruling is I am going to deny the

12  motion *in limine,* but if at trial either the evidence is not

13  probative on the issue of what Boehringer knew with regard to

14  150 dose and is not probative of showing that Boehringer was

15  aware of a way to warn more robustly — in other words, if

16  there's just some reference to the 110 milligram dose being

17  approved by some regulatory authority in Europe — then I'll

18  reconsider that type evidence, but I'm not going to prevent

19  them from putting up evidence that would show concerns about

20  the 150 milligram dose simply because there's reference to the

21  110.

22        MR. SCHMIDT:  And —

23        THE COURT:  And I will give a limiting instruction,

24  and I request that you provide me with a proposed one before we

25  start the trial.

1          MR. SCHMIDT:  Understood, Your Honor.

2          THE COURT:  And if counsel appears to mislead the

3    jury on the issue, then I will repeat the limiting instruction

4    as many times as it takes to get counsel's attention and the

5    jury's attention.  I'm not going to let you suggest to the jury

6    that they should have had on their warning a 110 milligram

7    dose.

8          MR. CHILDERS:  I understand.  We have no intention of

9    doing that, Your Honor.

10          MR. SCHMIDT:  I think —

11          THE COURT:  You are not going to be able to argue

12   that they were negligent by failing to actively pursue 110

13   milligram dose.

14          MR. CHILDERS:  Understood.  Understood.

15          THE COURT:  The evidence on the 110 milligram dose is

16   going to be restricted to showing the safety hazards or

17   concerns with the 150 milligram dose and that they knew how to

18   warn more robustly about those concerns and didn't do so.

19          MR. CHILDERS:  Yes, sir.

20          THE COURT:  That's going to be the focus.

21          MR. CHILDERS:  Absolutely.

22          THE COURT:  The negligence claim is not going to be

23   about them being negligent in not pursuing the 110 any more

24   than they did.

25          MR. CHILDERS:  I agree with Your Honor.

1              MR. SCHMIDT:  If I may just say, from understanding
2    Your Honor's ruling, from our perspective, we'll look at
3    putting in appropriate evidence that we did try to get the 110
4    approved and this is why the FDA thought for the very patients
5    we're talking about in this case 150 was better.  And obviously
6    then —
7              THE COURT:  Yes.  And you can certainly put in
8    evidence as to why your folks thought, under the circumstances
9    in the United States, the 150 was berobusttter than 75 and the
10   more rebust warning was not necessary.  And then the jury will
11   have all the relevant evidence, and somehow they'll do what
12   they usually do and miraculously find the truth.
13             Have y'all won one of these cases yet?
14             MR. CHILDERS:  Yes, sir.  We won the last case in
15   West Virginia.
16             THE COURT:  In West Virginia.
17             MR. CHILDERS:  Yes, sir.
18             THE COURT:  Was that in federal or state?
19             MR. CHILDERS:  Federal court, Your Honor.  It was the
20   first one that was in federal court.
21             THE COURT:  That was in front of Judge Goodwin.
22             MR. CHILDERS:  It was in front of Judge Chambers over
23   in the Huntington Division of the Southern District of West
24   Virginia.
25             THE COURT:  And is that the case where they ruled

```
 1   that the 110 shouldn't come in at all?
 2            MR. CHILDERS:  No.  The 110 wasn't at issue because
 3   the plaintiff there was on the 75 milligram dose, not the 150
 4   dose.  So this issue didn't come up in that trial.
 5            THE COURT:  All right.  What's the next one on
 6   your — that takes care of No. 2 on Mr. Callahan's agenda.
 7            What's next on your list, Mr. Schmidt?
 8            MR. SCHMIDT:  I believe it's argument Ms. Frost is
 9   going to make on foreign regulatory.
10            THE COURT:  Okay.
11            MS. FROST:  Yes, Your Honor.  I'm going to make the
12   argument on motion in limine No. 8 which has to do with foreign
13   regulatory issues.
14            THE COURT:  Okay.  And you are Ms. Frost?
15            MS. FROST:  Yes, sir.
16            THE COURT:  So you are with Mr. Lewis' firm.
17            MS. FROST:  I am, Your Honor.  I am.
18            THE COURT:  You didn't have anything to do with those
19   cases, though, did you?
20            MS. FROST:  I did not, no.  I came along a little bit
21   later.  And they don't let me do those down in Houston.
22            THE COURT:  Tell me what your motion in limine is.
23            MS. FROST:  All right.  Your Honor, Motion in limine
24   No. 8 has to do with evidence of foreign regulatory issues and
25   foreign labeling.  And to some extent, it is sort of a
```

1   follow—on in some ways to the 110, because the issue is that

2   the foreign regulatory requirements are different and the

3   labeling, as a result of that, is different than the labeling

4   in the United States.

5           THE COURT:  Let me ask Mr. Childers.  What do you

6   intend —— my intention in that previous ruling was that you can

7   get in evidence as to what Boehringer knew.  But do you intend

8   to try to offer evidence about what happened in the regulatory

9   process in Europe with regard to labeling?

10          MR. CHILDERS:  No, sir, no evidence whatsoever.  And

11   that hasn't come in in any trial so far.

12          THE COURT:  You are not going to try to put somebody

13   up to say the regulators in Europe approved or said 110 was

14   necessary and, therefore, that's what should have happened

15   here?

16          MR. CHILDERS:  No, sir.  And there hasn't been an

17   issue in any of the trials that have happened.  There hasn't

18   been a mini trial —— and all this evidence has come in in every

19   trial.  Just for the backdrop.

20          THE COURT:  All right.

21          MS. FROST:  Your Honor, the motion is actually

22   focused a little bit differently than that.

23          THE COURT:  Well, if it's something different than

24   what I have already ruled with regard to Mr. Schmidt's motion

25   *in limine*, I'll hear that.  But if it's going to capture that

1    evidence, then I have already made a ruling; it's coming in.

2    But if there's something distinct and different, then let me

3    know and we'll rule on it.

4           MS. FROST:  I understand that, Your Honor.  And what

5    I was going to say is, based on your previous ruling, it makes

6    my argument much, much, much quicker.

7           But I would request that the Court take a look at the

8    *Bliss v. Twin City* case that relates to the difference between

9    U.S. labels and foreign labels.  And while you have ruled about

10   what the knowledge issues are, what we have found in prior

11   cases is that the plaintiffs actually say the problem is that

12   the European level says X, the U.S. label says Y.  And because

13   there are very different philosophical decisions about what is

14   to be included in the labels, that makes that specific

15   presentation very prejudicial to us.  We understand your

16   argument as it relates to the knowledge issue.  But if —

17          THE COURT:  Rationale.

18          MS. FROST:  The rationale.

19          THE COURT:  My rationale, not argument.

20          MS. FROST:  I'm sorry.  Your rationale.  But in

21   relation to the specifics of the different labels —

22          THE COURT:  Well, I think that they should be able to

23   put in what y'all warned about in the European label as long as

24   they don't get into bolstering that as the best kind of label

25   because it has some regulatory approval over there.  My focus

1   is going to be making sure that it comes in as it relates to

2   their knowledge and their ability to provide a more robust

3   warning if they wanted to.  So —

4              MS. FROST:  Understood.

5              THE COURT:  — if you think they cross that line at

6   trial, somebody object and I'll address it then.  But generally

7   my ruling on this is going to be consistent with the ruling I

8   just made with regard to motion *in limine* No. 1.

9              I suppose that we'll indicate on our record that we

10  have essentially deferred ruling on this motion *in limine* No. 8

11  until we make sure at trial that Mr. Childers doesn't try to

12  cross the line that I have drawn.  But —

13             MR. CHILDERS:  Understood.

14             THE COURT:  — I'm not granting it at this time.

15             MS. FROST:  Thank you.

16             THE COURT:  No. 10 on the agenda list is defendant's

17  motion *in limine* No. 10.  FDA nonsubmission is what it says

18  here.

19             Is that you again, Ms. Frost?

20             MS. FROST:  Yes, Your Honor, that one is me as well.

21             Your Honor, this deals with the question of what

22  materials were submitted to the FDA concerning internal

23  deliberations and information about the medication.  And it

24  centers in large part on the testimony of Dr. Kliewer, who is

25  the internal person at Boehringer who dealt with the FDA, and

1   the question of what materials were submitted to the FDA and

2   what materials were not.

3           In 2014 Dr. Kliewer was deposed, and she gave

4   testimony about a variety of different things that had not yet

5   been submitted to the FDA.  Subsequent —

6           THE COURT:  What's her name again?

7           MS. FROST:  Kliewer, and it's spelled K-l-i-e-w-e-r.

8   She is one of our German witnesses, Your Honor.

9           THE COURT:  Okay.

10          MS. FROST:  Following that testimony in 2014, the

11  company did in fact submit those materials and they submitted a

12  significant amount of additional materials.

13          THE COURT:  What year was that?

14          MS. FROST:  2014.  Following her —

15          THE COURT:  Before the plaintiff here was prescribed?

16          MS. FROST:  No.  This would have been after the

17  prescription.

18          THE COURT:  After.  Before he died or after he died?

19          MR. CHILDERS:  It was after he died.

20          MS. FROST:  After he died.  Because the materials

21  were submitted in both July and August of 2014, starting in

22  July of 2014.

23          THE COURT:  So before he was prescribed, she omitted

24  some things.  And then after, she supplemented what was

25  omitted.

 1              MS. FROST:  Well, Your Honor, it's not —— it's the

 2    form in which the materials were supplemented.  Internal

 3    discussions were not an initial part of the submission for the

 4    drug approval.  The FDA was provided with all of the data

 5    related to the RE-LY trials.

 6              THE COURT:  Mr. Childers, you don't have a fraud on

 7    the FDA claim.

 8              MR. CHILDERS:  Of course not.

 9              THE COURT:  And that would probably be preempted

10    anyway.

11              MR. CHILDERS:  I agree.

12              THE COURT:  So how is this relevant?

13              MR. CHILDERS:  This is relevant, I think, Your Honor,

14    in the failure to warn, because what they get up and will argue

15    throughout trial is, FDA has approved our label 18 times —— I

16    think they say —— and has never required us to include any

17    information to doctors about how to measure plasma

18    concentrations or to do that, when, in fact, Ms. Kliewer says,

19    Even though the company believed all this and did this analysis

20    internally, we didn't actually share any of that information

21    with FDA.

22              THE COURT:  So it is a fraud on the FDA claim.  You

23    are not saying it's that, but ——

24              MR. CHILDERS:  I think it goes directly to rebut the

25    defense, which is FDA has never told us to do what plaintiffs

1    are saying we should do.  And that's because FDA didn't have

2    any of the information to be able to tell them to do that, for

3    one.  For two, obviously it's not the FDA's legal

4    responsibility to decide what goes in the label, although they

5    will argue as well that the FDA somehow should have done

6    something affirmatively to make Boehringer change the label.

7    But I do believe the evidence is definitely relevant to the

8    defense that they put on, which is FDA has never told us to

9    change our label.  But if they don't have the information,

10   there's no way the FDA could tell them to change their label.

11           THE COURT:  So you dispute that they still don't have

12   the information?

13           MR. CHILDERS:  I do dispute that they don't have some

14   of the information.  I think we laid out pretty carefully in

15   our response the way that information was transmitted to FDA

16   after Mr. Chambers died.  And it wasn't in the form of a

17   request to change the label.  Nothing was ever submitted to FDA

18   along the lines of a CBE, a changes being effected, label

19   change to say we want to include this information so that we

20   can give it to doctors.  And so I think that's all — none of

21   that information ever has been transmitted that way.

22           The only way it's been transmitted to FDA is just by

23   forwarding documents to the FDA that either came from third

24   parties or — actually, they all came from third parties

25   because they related to negotiations with the EMA, which is a

1   foreign regulatory body, and they related to articles that were

2   published in the *British Medical Journal*, which in fact the

3   defendants in this case are asking you to exclude from

4   evidence.  They are saying that those articles, by giving them

5   to the FDA, they have fulfilled any duty they had to make sure

6   FDA had this information, while at the same time they are going

7   to get up in a couple of minutes and tell you these articles

8   are —

9          THE COURT:  What about that, Ms. Frost?  If part of

10  your defense, at least to the negligence claim, is — the

11  negligence failure to warn claim — is that, look, we provided

12  all the information that the FDA needed and they approved what

13  we provided and you should consider that in determining whether

14  or not we acted as a reasonably prudent drug manufacturer in

15  deciding this — what should be warned, why shouldn't they be

16  able to put up evidence that you were less forthcoming with the

17  FDA than perhaps that suggests and then you be able to explain

18  the situation so that it's not kind of half in, half out, but

19  it's in and the jury can accept your defense or not?

20         MS. FROST:  Well, Your Honor, to the extent that the

21  implication — and it's really more than an implication; it's

22  an explicit statement — that the company didn't provide

23  information to FDA, that's just not correct.  The reason that

24  we filed the Kliewer motion is because Ms. Kliewer was deposed

25  again in 2017 and talked about all the materials that had been

1    provided to the FDA.  So to suggest to the jury that in some

2    way information was not withheld is —

3         THE COURT:  Did she not admit in her first deposition

4    that there was certain information that she had available to

5    her that was not submitted until some subsequent later time as

6    a supplement?

7         MS. FROST:  It was a question of timing.  It's not a

8    question of whether the materials were supplemented, Your

9    Honor.

10         THE COURT:  What did she say in her first deposition?

11         MS. FROST:  In the first deposition she identified

12    some information, some internal deliberations and discussions,

13    that were not part of the data set that was provided to the

14    FDA.  Following these British journal articles that

15    Mr. Childers alluded to, the company not only provided the

16    articles to make sure that the FDA was aware of this discussion

17    and what the complaints were but also provided any follow-up

18    data and the internal deliberations.

19         THE COURT:  When was the label approved by the FDA in

20    relation to her first submittal and her supplemental submittal?

21         MS. FROST:  2010 is the first approval of the label.

22         THE COURT:  So it was before her submittal or after?

23         MS. FROST:  It was before the deposition, yes, Your

24    Honor, and before this discussion.

25         THE COURT:  No, before her submittal.  Her first

 1    submittal was part of getting the label approved; correct?

 2              MS. FROST:  Yes, Your Honor.  The RE-LY data and all

 3    the supporting materials related to that.

 4              THE COURT:  So she was submitting the data knowing

 5    that what they were trying to do was get the label approved.

 6              MS. FROST:  That's true, Your Honor, but that implies

 7    a motivation —

 8              THE COURT:  I'm not implying anything.  I'm trying to

 9    get the chronology.

10              And then did she send the supplemental materials

11    before or after they approved the label?

12              MS. FROST:  There was an ongoing set of submissions.

13    The particular documents that we are talking about here were

14    sent in July and August of 2014, which is after the first label

15    but in the context of the ongoing discussions with the FDA.

16              THE COURT:  Okay.  So, Mr. Childers, your argument is

17    she sends the limited information and withholds what you think

18    is critical information; the label gets approved; and then she

19    does the supplement after the label has already gotten

20    approved.  Or is that not your contention?

21              MR. CHILDERS:  I would — I don't mean to split

22    hairs.  But a submission in my mind is when you actually

23    provide data either for a label change or for information that

24    the FDA needs to know about something that is important for the

25    drug.  She was forwarding by e-mail the *British Medical Journal*

1   articles to somebody at the FDA, who was her contact.  That
2   wasn't — I don't believe that was a submission.  But they did
3   later submit formally information that they gave to the EMA in
4   regard to this same issue.  But all that happened after
5   Mr. Chambers bled and died.  Not one bit of that transmission
6   happened while he was alive or while he was taking Pradaxa.
7   And that's the relevant time period for what the jury has to
8   decide in this case.  What Boehringer has done since then I
9   don't think is something that the jury would relevantly
10  consider in trying to —

11           THE COURT:  What do you contend — how is the
12  omission relevant to whether they negligently failed to warn?

13           MR. CHILDERS:  So the particular information that
14  we're talking about is an internal analysis, not just data but
15  analysis by the company of the data, where they determined if
16  we measure the Pradaxa level in patients' blood and change
17  their dose to make sure they stay in a certain range, we're
18  going to elim — not eliminate but significantly reduce the
19  risk of bleeding in patients and we're not going to
20  significantly change the stroke benefit that they are getting.
21  It's a positive.  That information is what we say doctors
22  should know.  And, in fact, part of that information is what
23  they tell doctors in the rest of the world.

24           Their defense is, FDA has approved our label 18 times
25  and never made us put that in there.  The reason FDA hasn't

1    made them put it in there, at least up until the time

2    Mr. Chambers died, was they had no idea this analysis had been

3    done.

4            MS. FROST:  And, Your Honor, the distinction that he

5    drew is actually an important distinction.  And I apparently

6    didn't make it quite clear enough.  All of the data was

7    submitted in advance of the approval of the label in 2010.

8    These materials in 2014 are internal discussions about what we

9    think the data reflects.  And we discussed these same issues in

10   the most recent Connecticut case and in fact reached a

11   stipulation with plaintiff's counsel, including Mr. Moskow who

12   is one of the trial counsels who has been admitted *pro hac*

13   here, that made it specifically clear that there were certain

14   additional materials that were provided to the FDA in 2014 to

15   2016.

16           THE COURT:  Did that stipulation result in the

17   exclusion of the omission ——

18           MS. FROST:  It ——

19           THE COURT:  —— in the Connecticut action?

20           MS. FROST:  It didn't result in an exclusion of the

21   testimony, but it made it clear, and we were able to read the

22   stipulation to the jury, that in fact there wasn't anything ——

23           THE COURT:  You want to —— do you have any problem

24   with ——

25           MR. CHILDERS:  I don't think it's inaccurate, but I

1   can tell Your Honor this same —— I mean ——

2          THE COURT:  It sounds like to me that your arguments

3   go to the weight of the evidence and not their admissibility.

4   I'm going to deny the motion *in limine* No. 10.

5          No. 13.  Who's going to handle that one?

6          MR. CALLAHAN:  Your Honor, I will.

7          THE COURT:  Mr. Callahan.

8          MR. CALLAHAN:  Thank you, Your Honor.  Plaintiff's

9   motion *in limine* No. 13 has to do with some articles that were

10  published by the British ——

11         THE COURT:  Your defendant's motion *in limine*.

12         MR. CALLAHAN:  Defendant's motion *in limine* No. 13,

13  Your Honor.  Excuse me.  That's not a good way to start.

14         THE COURT:  That's okay.

15         MR. CALLAHAN:  Defendant's motion *in limine, Your

16  Honor,* No. 13 is to exclude, really, Your Honor, any reference

17  to some articles that have been published in the *British

18  Medical Journal*, the *BMJ*.  Your Honor, these are not learned

19  treatises that the experts for the plaintiff are relying upon.

20  These articles, which we have given to the Court, are really

21  simply editorials or features that were developed with the use

22  of the plaintiff's lawyers communicating with the authors, who

23  are not scientists, not Ph.Ds or anything.  Simply what they

24  are trying to do is to put something in front of the jury,

25  these *BMJ* articles, that is a conclusion done ——

1          THE COURT:  So your argument is that they are hearsay

2     and don't fall within the learned treatise exception?

3          MR. CALLAHAN:  That's the gist of it.  And there's

4     other problems with it as well.

5          THE COURT:  What's the other objection?

6          MR. CALLAHAN:  Well, Your Honor, they have to do with

7     things that have no business in front of this jury, like the

8     financial status of the company, several other areas that have

9     been excluded already from this court.

10          THE COURT:  These are not the EPA official articles.

11          MR. CALLAHAN:  No, Your Honor.

12          THE COURT:  Those are other articles.

13          MR. CALLAHAN:  Your Honor, these are articles that

14     were done shortly after documents that had previously been

15     considered confidential were marked not confidential in a

16     previous case.  Right after that, these articles came out

17     relying upon those articles — relying upon those documents and

18     citing —

19          THE COURT:  Are these the articles that relate to the

20     issue we had about the person being able to be deposed?

21          MR. CALLAHAN:  That was the issue that came up, Your

22     Honor.

23          MR. CHILDERS:  Yes, sir.

24          THE COURT:  Okay.  Refresh my memory what the ruling

25     was on that.

```
 1              MR. CALLAHAN:  It was too late; we had not given you
 2    enough time to make ——
 3              THE COURT:  Didn't I say y'all could depose him ——
 4              MR. CHILDERS:  You reconsidered that opinion.
 5              THE COURT:  Wasn't the ruling based upon if they
 6    opened the door, then you could come in and —— seemed like it
 7    was ——
 8              MR. CHILDERS:  Your Honor ——
 9              MR. CALLAHAN:  I got the exact wording of your
10    ruling.
11              "The Court concludes that if plaintiffs introduced
12    Moore's articles Boehringer can have the opportunity to present
13    Moore's deposition testimony in response.  Boehringer shall be
14    permitted to designate Moore's deposition testimony for use in
15    this trial, but it shall only be admissible if plaintiff
16    introduces Moore's articles."
17              And what we're trying to do now is keep Moore's
18    articles out altogether.
19              THE COURT:  That's the same thing, the same articles.
20              So, Mr. Childers, how do you get these articles
21    admitted as not hearsay?
22              MR. CHILDERS:  Well, we wouldn't intend to admit
23    them, Your Honor.  I think they are learned treatises, so they
24    would be an exception to hearsay that an expert can ——
25              THE COURT:  You are going to have an expert identify
```

1    them as learned treatises.

2              MR. CHILDERS:  Correct.  It's the *British Medical*

3    *Journal*.  They're peer-reviewed articles.  They are not —

4              THE COURT:  Oh, you are going to have an expert

5    that's going to say, "I have looked at this article and I know

6    this journal and I know what this article is about and it meets

7    the criteria for a learned treatise."

8              MR. CHILDERS:  Correct.  I think they have already

9    testified to that in their deposition, Your Honor.

10             THE COURT:  Okay.  So that — assuming I agree with

11   him, which I'm not saying I do, but obviously if it's a learned

12   treatise, that gets over the hearsay objection.

13             So your objection is that contrary to what their

14   expert says, it's not a learned treatise?

15             MR. CALLAHAN:  It's not a learned treatise, Your

16   Honor.  This is not a scientifically done research project.

17   They do — the *BMJ* does state that these things are peer

18   reviewed.  But *BMJ* also has published articles that says the

19   peer review is sort of ridiculous in that it — even when they

20   intentionally put false articles out, false information in

21   articles, and they give them to be peer reviewed, people don't

22   even find out those discrepancies or those problems.

23             But, Your Honor, usually in a learned treatise you

24   are going to have a scientific method, something done that's

25   generally accepted in the scientific community.  These are

 1    investigative journalists that have interviewed the plaintiff's

 2    counsel in this case and have reviewed documents provided to

 3    them by the plaintiff's counsel.  And they make opinions

 4    that — I mean, just by looking at the headline of these

 5    articles, Your Honor — for instance, "How the Drug Company

 6    Withheld Important Analysis" is the Cohen finding.  In other

 7    words, they are relying upon somebody who's looked at documents

 8    not necessarily even in evidence or relevant to this case and

 9    have made a determination in an article that the company has

10    withheld important information.  And that is not something that

11    an investigative journalist should be allowed to tell a jury.

12    That is something that the jury should decide on its own based

13    upon the evidence and the documents that are relevant to this

14    case.

15            Your Honor, another article is "Concerns Over Data in

16    the Key Trial."  "Bleeding and the regulators."  These are

17    opinions that have been formed and decisions that have been

18    made not by scientists and not by people doing research into

19    all the facts but, rather, talking with the plaintiffs'

20    attorneys and getting information in front of the jury that the

21    plaintiffs want to present to the jury and then decide that

22    these are independent articles, that these are things that can

23    be relied upon because they are reliable and they're

24    independent, and they are not independent and they are not

25    reliable.

1            THE COURT:  And who says that other than Neal
2    Callahan?
3            MR. CALLAHAN:  Your Honor, I think if you read the
4    articles, you would — Your Honor, as you read —
5            THE COURT:  They apparently have got an expert, who I
6    assume is in the — at least has the qualifications — maybe
7    not.  You can tell me.  I'm assuming he has the qualifications
8    to opine as to whether something including this subject
9    matter — an article on this subject matter is a reliable
10   authority in his field of expertise.  And if he says that it is
11   and the lawyer says that it's not, I guess I have ultimately
12   got to determine whether the expert has carried the day on
13   establishing that it's a reasonable authority or a reliable
14   authority.
15           MR. CALLAHAN:  Your Honor, what would be confusing to
16   the jury is if they were to say that these are reliable and are
17   independent and the jury doesn't find out that these articles
18   are based upon communications from the author of the article
19   with plaintiffs' counsel.
20           THE COURT:  That happens — I know that has happened
21   in our Mentor trials on a couple of occasions, where one expert
22   says this is a reliable authority and it has this opinion in it
23   and another expert comes in and says that's not a reliable
24   authority and this over here is a reliable authority.  And it's
25   ultimately up to the jury to give weight to whether they

1  think — what weight it should be given.  But you are saying

2  this doesn't even get through the first gate.

3          MR. CALLAHAN:  As a gate keeper, Your Honor, this —

4          THE COURT:  I think I do have to decide whether it's

5  a reliable authority.

6          You are saying even if the *British Medical Journal* is

7  sometimes a reliable publisher of reliably authoritative

8  articles, this one isn't it; this article doesn't cut it.

9          MR. CALLAHAN:  Your Honor, these clearly don't cut

10  it.  The jury would not know because the expert would not know,

11  because it would be hearsay there, how the author of this story

12  came up with its opinions and its prejudicial statements.

13          THE COURT:  Have you got — has this been admitted in

14  any of the other trials?

15          MR. CHILDERS:  I don't believe so, Your Honor.  I

16  don't believe it's been attempted to be admitted in any trial.

17          MR. CALLAHAN:  Your Honor, in the other trials

18  there's been stipulations between plaintiffs' counsel and

19  defense counsel on this issue.  And we were hoping that we

20  could just come with a stipulation similar to that here, but

21  plaintiff's counsel does not want to do that.

22          THE COURT:  You mean stipulations about some of it

23  being admitted and some not, or what?

24          MR. CALLAHAN:  Stipulations as to be read to the jury

25  as to — that plaintiffs' attorneys had spoken to the authors

1   of the story before it was written and other issues.

2          THE COURT:  That's what I'm asking.  Has it been

3   admitted in the past with the caveat or restriction that

4   allowed the defendant to explain counsel's involvement in the

5   publication?

6          MR. CALLAHAN:  It's never —

7          THE COURT:  My understanding was that the whole

8   brouhaha that we had about the deposition was that — wasn't

9   that going — or isn't that the author of the article?

10         MR. CALLAHAN:  That's right.

11         THE COURT:  Who now you claim repudiates it or

12  explains how it came to be with regard to the involvement of

13  lawyers or something?

14         MR. CALLAHAN:  No.  He's hiding from being deposed.

15         THE COURT:  What is it about his deposition — did

16  you want his deposition, or did they want his deposition?

17         MR. CALLAHAN:  Your Honor, we wanted his deposition.

18         THE COURT:  Why?

19         MR. CALLAHAN:  Because we want to find out what his

20  communications were with plaintiffs' counsel and how he got

21  documents that he was relying upon and what documents he relied

22  upon.  We wanted to show that his article was not reliable and

23  that it was prejudiced —

24         THE COURT:  Did I not say you could depose him if

25  they were going to introduce it, or I said you could rely on

1    his previous deposition?

2              MR. CALLAHAN:  You were going to say if they were

3    going to bring it up, we were going to be allowed to depose

4    him.  But, Your Honor, this individual is not — he's been

5    ordered to be deposed.  He's been ordered to do discovery.  And

6    he's hidden from it.  He's appealed the issue.

7              THE COURT:  So my —

8              MR. CALLAHAN:  So it can't be done.

9              MR. CHILDERS:  He was deposed, Your Honor.

10             THE COURT:  — decision to admit it is conditioned on

11   him being deposed.

12             MR. CHILDERS:  He has been deposed.  He's been

13   deposed.  So that deposition went forward.

14             THE COURT:  Was he deposed on these issues?

15             MR. CHILDERS:  Yes.

16             THE COURT:  That's what I thought.  I thought that

17   was all happening bang, bang, bang.

18             MR. CHILDERS:  It did.  It all happened.

19             THE COURT:  He was deposed and they questioned him

20   about y'all's involvement or whoever —

21             MR. CHILDERS:  Not me, Your Honor.

22             THE COURT:  Plaintiffs' steering committee lawyers'

23   involvement with him.  I thought all that happened.

24             MR. CHILDERS:  Yeah, he was deposed at Mr. Schmidt's

25   office.  That's where he went and got deposed.  So it did

1    happen.  And you ruled if we bring this up, they are allowed to

2    put his deposition on.  I think that solves all the issues they

3    are complaining of.  It goes to the weight, not the

4    admissibility.

5              MR. CALLAHAN:  That was to Mr. Moore, Your Honor.

6    That was the only one we could get.  But there were other

7    articles authored by other people that have not been taken.

8              And with Mr. Moore's would we be able to get a

9    stipulation similar to trials we have had in the past as to be

10   read to the jury on how he obtained his information without

11   reading his deposition?

12             THE COURT:  Well, I thought that the matter had been

13   fixed from my perspective when I knew that y'all were going to

14   have an opportunity — when there was an opportunity to depose

15   him on the concerns you had.

16             MR. CALLAHAN:  But, Your Honor, there's also other

17   information that is in these articles.

18             THE COURT:  Did you attach the actual articles to

19   your motion *in limine*?

20             MR. CALLAHAN:  Yes, Your Honor.

21             THE COURT:  All of them that you seek to be excluded?

22             MR. CALLAHAN:  The ones I read have been.

23             THE COURT:  How many of them are there?

24             MR. CALLAHAN:  Five.

25             THE COURT:  And you claim none of them meet the

 1   learned treatise —

 2             MR. CALLAHAN:  That is correct.

 3             MR. CHILDERS:  Your Honor, we stipulated —

 4             THE COURT:  You stipulated what?

 5             MR. CHILDERS:  We stipulated to two of them we

 6   weren't even going to attempt to rely on.  There's only three.

 7   It's in our response at Footnotes 3 and 5 on page 2.

 8             THE COURT:  Have these been admitted in other trials?

 9   No, you said this is the first time.

10             MR. CHILDERS:  Yes, sir.

11             THE COURT:  What's your response to them not getting

12   over the initial hurdle of being a learned treatise?

13             MR. CHILDERS:  I think that our expert's reliance on

14   them, I think she established that in her deposition.

15   Certainly if she gets here and you don't think she's

16   established that on the stand, then you can make that decision

17   at that time.

18             THE COURT:  Oh, the witness that relies upon them as

19   learned treatises is going to testify live?

20             MR. CHILDERS:  Yes, sir.

21             THE COURT:  Okay.  I'm going to defer ruling on this

22   until I hear her testify at trial.

23             Does that take care of all of the defendant's motions

24   that defendant wanted to be heard on in oral argument?

25             MR. SCHMIDT:  There's one more motion, which is Item

1   No. 6.

2          THE COURT:  I'm going to get to plaintiff's motions.

3          MR. SCHMIDT:  Yeah, defense motion and plaintiff's

4   motion on the same issue.

5          THE COURT:  What issue is that?

6          MR. SCHMIDT:  No. 6, the spoliation issue.  We have a

7   motion to exclude evidence on it.  They have a motion for an

8   adverse inference instruction on it.

9          THE COURT:  Mr. Childers, I have got significant

10  concerns about adopting a spoliation inference based on

11  discovery — alleged discovery — well, discovery sanctions

12  that occurred before another judge when I was not the judge

13  that was involved in managing the discovery at that time.

14         MR. CHILDERS:  I understand, Your Honor.

15         THE COURT:  I'm denying your motion with regard to

16  the spoliation.  So that's defendant's motion *in limine* No. 9.

17  Is that right?

18         MR. SCHMIDT:  Yes, Your Honor.

19         THE COURT:  So that's granted.

20         And plaintiff's spoliation motion, which I don't have

21  that number here, but that's denied.

22         MR. CHILDERS:  I believe it's Docket No. 61, Your

23  Honor.

24         THE COURT:  I guess in your motion you sought

25  affirmatively for the Court to make the inference.

```
 1              MR. CHILDERS:  That's correct, Your Honor.
 2              THE COURT:  So your motion is denied.  Defendant's is
 3    granted.
 4              We're going to take a break in just one minute.
 5              Does the plaintiff want to be heard on plaintiff's
 6    omnibus motion in limine or defendant wants to be heard with
 7    regard to that?  How many motions in limine are —— refresh my
 8    memory —— are in the plaintiff's?
 9              MR. CHILDERS:  There are five in there.  There's
10    only —— there was three that we wanted to discuss, really.
11              THE COURT:  Why don't we take a 10-minute break, and
12    we'll come back and try to finish this.  And then we'll be done
13    hopefully, and then everybody can go to lunch or whatever.  We
14    won't come back after lunch.  I would rather just finish the
15    whole thing before we take a lunch break.  So we'll be in
16    recess for 10 minutes.
17         (Brief break)
18              THE COURT:  Be seated.
19              All right.  Mr. Schmidt, did Judge Herndon —— he
20    didn't have to rule on any of these difficult pretrial —— he
21    just strong-armed everybody into settling.
22              MR. SCHMIDT:  I have said nothing on the record.
23              THE COURT:  I understand.
24              Okay.  Well, he's not alone.  A lot of those
25    transferee judges, they have got to focus on settlement.
```

1              Your motions *in limine*, Mr. Childers.

2              MR. CHILDERS:  Yes, sir.  It's okay if I stand here?

3              THE COURT:  Yes, sir.  Just make sure the court

4    reporter can hear you.

5              MR. CHILDERS:  Can you hear me okay?

6              We had three, Your Honor, that we wanted to address

7    with the Court of our five motions or five separate issues that

8    were in our omnibus motions *in limine*.  *The* first one being

9    testimony or reference to the Pradaxa label as the FDA label or

10   any suggestion that the FDA drafted or is legally —

11             THE COURT:  I'll handle that at trial.  I'm going to

12   defer ruling on that.  I'm assuming these lawyers are good

13   lawyers and ethical lawyers and they are not going to make any

14   kind of misrepresentations or engage in any kind of tricks or

15   anything like that.  If they refer to it in a misleading way,

16   then I will instruct the jury about it.

17             MR. CHILDERS:  Understood.  I guess the main issue

18   that we were concerned about, Your Honor, is —

19             THE COURT:  It is an FDA-approved label, is it not?

20             MR. CHILDERS:  It is.  It is.  So the issue mainly

21   we're concerned with, in the last several trials the defendants

22   have said that the FDA has a legal responsibility to alert them

23   if the FDA believes the label should be changed and that

24   because that hasn't happened, that somehow relieves them of

25   some responsibility for the contents of the label.  That's not

1   consistent with *Wyatt v. Levine*, and even the CFR that they

2   cite specifically —

3           THE COURT:  Well, if they make any representations

4   that are contrary to the law, you bring it to my attention.

5   And if I agree with you, I will bring it to the jury's

6   attention.  You think these lawyers have done that?

7           MR. CHILDERS:  Yes, sir.

8           THE COURT:  Okay.  Well, I'll be alert.

9           MR. CHILDERS:  Okay.  The next one, Your Honor, deals

10  with —

11          THE COURT:  We're going to indicate on the record I'm

12  deferring ruling on that until it comes up at trial.

13          MR. CHILDERS:  Yes, sir.  The next is — this is just

14  how we have titled it — "any argument or suggestion that the

15  FDA-determined dose adjustment would not be beneficial and/or

16  that Boehringer's titration analysis was flawed."  We spoke a

17  little bit earlier about the analysis that was not transmitted

18  to FDA through Ms. Kliewer.  That's what we're discussing at

19  this particular — in this particular motion.

20          THE COURT:  Explain this to me again.

21          MR. CHILDERS:  Yes, sir.  So the company internally

22  did a titration analysis.  And when I say that, I mean they ran

23  a computer simulation based on the data they had that showed if

24  they adjusted patient's dose of Pradaxa to keep them in a

25  certain range that they would reduce the number of bleeds

1  people had but they would maintain the efficacy of stroke

2  prevention.  So we anticipate they will argue that FDA has

3  considered that information and has decided that that is not an

4  appropriate bit of information to be in the label.  The reason

5  we don't think that is an appropriate argument, Your Honor, is

6  because there's never been a label change requested by

7  Boehringer for the FDA to officially say, yes, we agree with

8  that; no, we don't agree with that.  And because of that —

9              THE COURT:  So you think they are going to suggest

10 that they are prevented from making the change?

11             MR. CHILDERS:  No.  What I believe they'll suggest is

12 FDA has made a determination that what the plaintiffs are

13 telling you is not appropriate for the label, when in fact FDA

14 has not ever been presented with that question directly by the

15 company.

16             THE COURT:  They got a witness that's going to say

17 this?

18             MR. CHILDERS:  They have several witnesses who claim

19 FDA has considered all the information we gave them.

20             THE COURT:  Why can't you cross-examine them?

21             MR. CHILDERS:  Because they're on video and they were

22 taken, some of them, before we were involved in the case.

23             THE COURT:  There you go.  That's the problem.

24 That's another problem with video depositions.

25             MR. CHILDERS:  Your Honor, this direct issue was

1    addressed by Judge Chambers in the Knight case, and we cited

2    that as well.  He agreed that because there had never been a

3    label change suggested to FDA by the company, there's never

4    actually been a determination made by FDA.  Certainly we're not

5    suggesting that BI be prevented from saying, We gave

6    information to FDA.  It's them to affirmatively represent FDA

7    has made a determination, when there is no evidence of that.

8              THE COURT:  I can't imagine Mr. Schmidt would argue

9    that the FDA has made a determination if in fact they have not

10   done so.

11             You wouldn't do that, would you, Mr. Schmidt?  Would

12   you?

13             MR. SCHMIDT:  No.  What we would say is that it is a

14   fact — and their own expert witness, the one that's going to

15   put on some of this evidence, agrees with this; it's just a

16   basic fact — that the FDA has said if we get information that

17   we think calls on us to act, whether that's directing a label

18   change or something else, we'll act.  Our argument is not that

19   we've asked the FDA to change the label on this point.  We

20   don't think it's appropriate.  It's not that the FDA has

21   refused a label change on this point, because we haven't asked

22   for it.  It's that we have given the FDA the relevant

23   information that we have.  And actually in publications FDA

24   scientists have said we don't think this makes sense.  That's

25   our argument based on — it's the simple argument that the FDA

1  has had this information; they have not ordered a label change;

2  and they have actually published —

3            THE COURT:  I'm going to wait and see how it comes in

4  at trial in the context of the trial.  I'm going to defer

5  ruling on that.  I'm not going to rule it out *in limine.*  So

6  object at trial if you think —

7            MR. CHILDERS:  Yes, sir.

8            THE COURT:  — he's misrepresenting the law.

9            What's the next one?

10           MR. CHILDERS:  The last one, Your Honor, is to

11  exclude an opinion article called "Anticoagulant Options, Why

12  the FDA Approved a Higher But Not a Lower Dose of the

13  dabigatran."  This is — we all refer to it as the "Beasley

14  article."  He was the first named author on the article.  It's

15  not actually an article.  It is clearly an opinion piece that

16  was published by three people who worked at FDA.  It's not an

17  official statement from the FDA.  And it —

18           THE COURT:  Where is it published?

19           MR. CHILDERS:  The *New England Journal of Medicine.*

20  It's in a particular — it's not a peer-reviewed document.

21  It's —

22           THE COURT:  How is this different than your article

23  that's in the British —

24           MR. CHILDERS:  Because those are peer-reviewed

25  articles, Your Honor, that —

1              THE COURT:  Your article in the British Journal was

2     peer reviewed.

3              MR. CHILDERS:  Those are the only ones that we would

4     attempt to bring in the case.  We agreed we wouldn't try to

5     bring in any opinion pieces into the case that weren't peer

6     reviewed.

7              So what will happen is, the ——

8              THE COURT:  Why is this not hearsay, Mr. Schmidt?

9              MR. HALPERIN:  Actually, Mr. Halperin.

10             THE COURT:  You are going to handle it.  Yes, sir.

11             MR. HALPERIN:  Your Honor, this isn't hearsay because

12     we're not using it for a hearsay purpose.  We heard a little

13     bit this morning about whether the 150 dose is too much.  In

14     this article the FDA directly ——

15             THE COURT:  You agree this is not a learned treatise.

16             MR. HALPERIN:  We don't, Your Honor.  But even so, we

17     don't think we need to get there because ——

18             THE COURT:  You think it is a learned treatise?

19             MR. HALPERIN:  We do believe it is a learned

20     treatise.  In fact, Dr. ——

21             THE COURT:  You realize these things are transcribed.

22     And so in future cases, when somebody is trying to put in an

23     article that is not peer reviewed, you are going to be on

24     record as saying those are learned treatises.

25             MR. HALPERIN:  We don't think that ——

```
 1              THE COURT:  You really think a nonpeer-reviewed
 2   article is a learned treatise?
 3              MR. HALPERIN:  We do, Your Honor, when we have got
 4   plaintiff's own experts, the one expert in this case,
 5   plaintiff's case-specific expert, who plaintiffs have said they
 6   will have present at trial, has on his reliance lists an
 7   article he relied on is this very article.
 8              THE COURT:  No, I'm not saying at the moment that it
 9   couldn't be admissible for some other reason.  But how does
10   that make it a learned treatise?
11              MR. HALPERIN:  We just don't think that the dividing
12   line between admissibility and nonadmissibility is whether or
13   not something is peer reviewed.  We think we have got to look
14   at the article on a case-by-case basis and say is this
15   reliable.  Whether it's peer reviewed or not may be relevant to
16   that question, but it's not the determining factor.
17              THE COURT:  Okay.  So you think it does come in as an
18   exception to hearsay because it's a learned treatise, or not?
19              MR. HALPERIN:  We do believe that, but that's not our
20   primary argument, Your Honor.  Our primary argument is this is
21   not hearsay.
22              THE COURT:  Okay.  So your other argument is stronger
23   than the learned treatise argument.
24              MR. HALPERIN:  We believe so, yes, Your Honor.
25              THE COURT:  And tell me what that is again.
```

1            MR. HALPERIN:  This article is not being used for the
2    truth of the matter asserted as to whether or not the 150
3    milligram dose is in fact too much.  As Dr. Plunkett, who's
4    plaintiff's regulatory expert, testified under oath, in this
5    article the FDA, the agency responsible for approving Pradaxa
6    and, if so, in what dose, made a determination, disagreed with
7    Dr. Plunkett's view and the view that plaintiffs have expressed
8    this morning that the 150 milligram dose is too much.  We're
9    not using this article to say whether or not is it true the 150
10   milligram dose — is it too much.  We're using it to show the
11   FDA's opinion on that issue.  This article was authored by
12   Dr. Unger, who is the FDA official responsible for making the
13   decision.
14            THE COURT:  In the article the FDA official says it's
15   the FDA's opinion that the 150 milligram dose is not too much.
16            MR. HALPERIN:  Yes, Your Honor.  In fact,
17   Dr. Plunkett testified under oath.  She was asked in the first
18   Pradaxa trial whether the FDA in that article disagreed with
19   your view.  And she said yes.  I can get Your Honor the cite
20   for that.  Give me one second.
21            THE COURT:  No.  What I'm trying to figure out — you
22   want to cross-examine Dr. Plunkett with this article?
23            MR. HALPERIN:  Yes, Your Honor, as well as use it in
24   other —
25            THE COURT:  She's going to say what?

1              MR. HALPERIN:  That in this article the FDA disagreed

2     with the view that the 150 milligram dose is too much for

3     certain patients, including specifically the patients that we

4     heard this morning:  patients over 80, patients with moderate

5     kidney impairment.  In this article the FDA specifically

6     considered those patient populations and came to the

7     conclusion — it's in the article itself — that ultimately the

8     FDA's decision — and this is a direct quote — "Ultimately the

9     FDA's decision to approve only the 150 milligram dose was based

10    on its inability to find any patient population for whom the

11    lower dose would not represent a substantial disadvantage."

12    That's the FDA not only saying that the 150 —

13             THE COURT:  All right.  So in order to

14    successfully — for her to be successfully impeached with that

15    part of the article, isn't the jury going to have to conclude

16    that what the author of the article said is true?

17             MR. HALPERIN:  No, Your Honor.  We're not

18    establishing — we don't want this article to say is it true

19    that the 150 milligram —

20             THE COURT:  No, no, no.  I know you don't want it to

21    say that because you want to get it in as not hearsay.  But

22    what I'm asking you is, in order for you to successfully

23    impeach the witness, for the jury to say, "We find the

24    witness's testimony not believable because of this article,"

25    does the jury not have to find that what is stated in the

1  article is true?

2          MR. HALPERIN:  We don't think the jury does, Your

3  Honor.  And here is why.

4          THE COURT:  How can the jury find that she has been

5  successfully impeached —

6          MR. HALPERIN:  Well, Your Honor —

7          THE COURT:  — and not find that what the article

8  says is true?

9          MR. HALPERIN:  Your Honor, the jury can agree with

10  Dr. Plunkett that the 150 milligrams is in fact too much.

11          THE COURT:  I know.  That's the point.  They can

12  agree with Dr. Plunkett, or they can agree with the FDA

13  article — what the author of the article says.  But what you

14  are asking them — that's what you are asking them to evaluate:

15  Do you believe Dr. Plunkett, or do you believe the actual FDA

16  person who was there making the determinations?  You are asking

17  the jury to determine whether they believe what she said in the

18  article is true or not.  And why is that not classic hearsay

19  unless it's a learned treatise?

20          MR. HALPERIN:  Well, Your Honor, we're not asking the

21  jury to take a position on whether the 150 milligram dose is

22  too much.  What we're asking the jury to recognize is that the

23  FDA has to approve the label; it has to approve the dose that

24  the drug is sold in; and it has to approve the labeling that

25  the medicine is in.  We can't put in the label instructions

1  that say the 150 milligram dose is too much unless the FDA

2  says, "That's okay with us."  In this article the FDA expressed

3  a different opinion than Dr. Plunkett on that article.  Now,

4  whether that opinion is right or not, that's the opinion

5  expressed in this article and that's ——

6           THE COURT:  Whether that opinion is right or true.

7           MR. HALPERIN:  We're not asking the jury to make that

8  determination as to the truth of that opinion.  We're simply

9  asking the jury to take notice of that opinion.  This was the

10 FDA's opinion.  Not that whether it's true or not that the 150

11 milligram dose is too much.  Simply that this was the FDA's

12 opinion as expressed in the article.  And the jury can draw an

13 inference from that that the FDA would not have approved the

14 labeling changes that the plaintiff is asking the jury to hold

15 Boehringer liable for failing to warn.

16          THE COURT:  And you are saying that they don't have

17 to determine what is stated in the article is true to make that

18 inference?

19          MR. HALPERIN:  They don't have to determine whether

20 the 150 milligram dose is truly too much.  That's classic

21 hearsay.  The FDA expressed the view in that article that the

22 150 milligram dose is not too much.  We're not asking the jury

23 to agree or disagree that the 150 milligram dose is too much.

24 We're asking the jury to take notice of the fact that the FDA

25 expressed an opinion and that opinion —— not the truth or

1    falsity of the opinion — just that that opinion was issued.

2              THE COURT:  You want the jury to be on notice that

3    the FDA has indicated that the 150 milligram dose is not too

4    much.

5              MR. HALPERIN:  I'm sorry.  I didn't follow that, Your

6    Honor.

7              THE COURT:  You want the jury to conclude that the

8    FDA has taken the position that the 150 milligram dose is not

9    too much.

10             MR. HALPERIN:  Absolutely.  And that's what

11   Dr. Plunkett said when shown this article in the first trial.

12             THE COURT:  She says that they took the position that

13   it was too much.

14             MR. HALPERIN:  That it was — that the 150 milligram

15   was not too much, that that — and that's the opinion that's

16   directly contrary to her opinion as she testified to the jury

17   and, we expect, in light of Your Honor's ruling this morning,

18   she will give again to this jury.

19             THE COURT:  What about it, Mr. Childers?  He says

20   that the jury is not being asked to determine from that

21   testimony that the 150 milligram dose was or was not too much;

22   they are just being asked to determine that the FDA has taken

23   the position that it's not too much.

24             MR. CHILDERS:  I don't know how that's not asking the

25   jury — that's not the truth of the matter of the hearsay in

1    this document.  I think you hit the nail on the head.  They are

2    asking them to compare Dr. Plunkett's opinion with the FDA's

3    opinion, and that's whether which one is true, which one is

4    accurate.  But — I don't know how you put this in and say it's

5    not being offered for the truth of the matter asserted.  If you

6    are offering that opinion, if you are bringing it for that

7    purpose, it has no relevance because you have already ruled out

8    the plaintiff's claim that the 110 milligram dose should have

9    been warned about or should have been told to doctors.  This

10   article says this is why we didn't approve the 110 dose.

11   That's what this article says.  It doesn't say 150 is not too

12   much for patients.  That's — if they could point to you

13   somewhere in this article it says that, I'll be glad to see it

14   myself.

15           What it says, the sentence that was just read to you

16   by Mr. Halperin, was the FDA's decision to approve only the 150

17   strength was based on our inability to identify a subgroup in

18   which the use of the lower dose, the 110, wasn't better than

19   the 150.  It's not saying 150 is great for everybody.  It's

20   saying the 110, we couldn't find a particular group that it's

21   better than the 150.  Those are two very different things.  So

22   if they are trying to offer this to show that was the FDA's

23   opinion, it's irrelevant based on your prior rulings about the

24   110 milligram dose.

25           I believe they are trying to offer it for the truth

1   of the matter that FDA thinks 150 is not too much and,

2   therefore, the jury should think 150 is not too much.

3   Otherwise, there's no reason for this.

4            THE COURT:  Well, I mean, they could get that

5   evidence in in a manner that's not hearsay.  You agree with

6   that.

7            MR. CHILDERS:  I do, Your Honor.  But this is an

8   article written by three people who have never been deposed.

9   It's not peer reviewed.  It is clearly an opinion.  It's called

10  a perspective.  That's the particular part of the journal that

11  is published in.  So it is out-of-court statement.  And we do

12  believe it's being offered for the truth of the matter asserted

13  based on how they want to use it to impeach a witness.

14           THE COURT:  Yes, sir, Mr. Halperin.

15           MR. HALPERIN:  Your Honor, a few quick points.  I

16  think what we just heard is that plaintiffs want to be able to

17  point to 110 milligram statements and the Company Core Data

18  Sheet and the European label and they can use that as a sword

19  but we can't point to statements in the context of the 110

20  milligrams in responding to that.

21           THE COURT:  I don't really necessarily buy

22  Mr. Childers' relevance argument.  I'm more concerned about

23  this fine hearsay distinction that you are making here.

24  Basically the jury is going to hear, if I admit this, that the

25  FDA's position is that the 150 milligram dose is not too much.

 1            MR. HALPERIN:  Well, Your Honor ——
 2            THE COURT:  They may can hear that through other
 3    evidence.  But to hear it through a statement by a party
 4    outside of court and to argue that, well, the jury can be told
 5    it's not really being admitted for that purpose and you
 6    shouldn't consider it for the purpose of the FDA —— for the
 7    truth of whether 150 milligram dose is appropriate or not —— is
 8    harmful or not, too much, but you should consider it just for
 9    the purpose of determining what the FDA's position was with
10    regard to whether 150 milligram dose is too much?
11            MR. HALPERIN:  Well, that's, Your Honor, where I
12    return to the learned treatise exception.  We have got an
13    article authored by senior FDA scientists, including the FDA
14    scientists responsible for ——
15            THE COURT:  If you can convince me that it's a
16    learned treatise, then —— even if it's a learned treatise, you
17    just would be able to —— are you seeking to have the entire
18    article admitted to impeach her or just that one sentence?  A
19    learned treatise you couldn't even introduce the entire
20    article.  The jury would just be read the part that is
21    relevant.
22            MR. HALPERIN:  Understood, Your Honor.  And that's
23    where we draw that distinction.  If it's not hearsay, it can be
24    admitted.  If it is hearsay under a learned treatise exception,
25    we understand the rules of evidence don't permit the exhibit

1    itself to go into evidence, although we could show it ——

2                THE COURT:  You want to put the whole exhibit in just

3    to impeach her on this one point where she says something

4    contrary to the article.

5                MR. HALPERIN:  Your Honor, it's not just one point.

6    That, as we understand it, is basically their case.  Their case

7    is let's tell the jury that the 150 milligram dose is too much,

8    when the FDA made a determination otherwise.  And if it's a

9    learned treatise, we have got the FDA official who literally

10   signs the approval letter.

11               THE COURT:  They are not contending that the FDA ever

12   concluded that 150 milligram dose was too much.

13               MR. HALPERIN:  Their claim is that Boehringer

14   concluded ——

15               THE COURT:  I think the evidence is going to be that

16   the FDA approved a label that allowed for a 150 milligram dose.

17               MR. HALPERIN:  Your Honor, our defense to the 150

18   milligram dose is too much ——

19               THE COURT:  Y'all's position is not that a 150

20   milligram dose is appropriate in every circumstance for every

21   patient, is it?

22               MR. HALPERIN:  Our position is ——

23               THE COURT:  —— is that the doctors should consider

24   what dose to give based on your warning.

25               MR. HALPERIN:  Correct.  And our warning says unless

1    you have severe kidney impairment, you should be on the 150

2    milligram dose.

3            THE COURT:  Oh, it does.  So y'all think everybody

4    should be on the 150 unless you have got severe kidney ——

5            MR. HALPERIN:  Where the only two options are the 150

6    and the 75, Boehringer's belief, which is consistent with the

7    FDA's belief, is that the 150 milligram dose is the right dose

8    for those patients.

9            And if we could return to the learned treatise ——

10           THE COURT:  Why can't you —— you can't get somebody

11   that authored this to testify?

12           MR. HALPERIN:  Authored the —— this Beasley article?

13           THE COURT:  Yeah.

14           MR. HALPERIN:  Your Honor, it's three FDA officials.

15   They are beyond the subpoena power of the court.  I believe

16   they are all in Maryland or D.C.

17           THE COURT:  Couldn't take their deposition?  I'm just

18   figuring out whether you could reasonably remove the hearsay

19   problem.  This has hearsay all over it to me.  I mean, I

20   understand your distinction that you are trying to make, which

21   is, you know —— and I think in law school it would be a great

22   exam question.  But to say that allowing evidence that it's the

23   FDA's position that 150 milligrams is not too much, but you are

24   not —— the jury should not consider that official position for

25   the fact that 150 milligrams is not too much but should only

1  consider it as being their opinion that it's not too much —

2          MR. HALPERIN:  To be clear, Your Honor, this evidence

3  was allowed in both of the Connecticut trials where the 150

4  milligram dose issue arisen.

5          THE COURT:  They allowed the admission of the entire

6  article?

7          MR. HALPERIN:  They did, Your Honor, under the

8  distinction between Connecticut law and federal rules of

9  evidence, where in Connecticut learned treatises actually are

10  admitted into evidence.  They are not here.  But these articles

11  were allowed to be shown to witnesses.

12          THE COURT:  The state court judge found that they

13  were learned treatises?

14          MR. HALPERIN:  The state court found that they could

15  be used to rebut this claim that 150 milligrams is too much.

16          THE COURT:  Because they were learned treatises under

17  Connecticut law?

18          MR. HALPERIN:  It wasn't parsed out that way.

19          THE COURT:  I thought there was a discussion between

20  the difference between federal law and Connecticut law on

21  learned treatises.

22          MR. HALPERIN:  Well, the distinction is simply does

23  it get admitted as an exhibit and go back to jury or not.

24          THE COURT:  The judge — did the judge admit it as a

25  learned treatise under Connecticut —

1              MR. HALPERIN:  It was admitted as an exhibit.
2              THE COURT:  Was it admitted as a learned treatise
3    under Connecticut law?
4              MR. HALPERIN:  It was not admitted under a specific
5    exception.  It was simply admitted.  If you look at the
6    transcripts, the transcripts don't make clear the reasoning of
7    the trial judge as to why it was or was not admitted.
8              THE COURT:  So the trial judge didn't say he thought
9    it was a learned treatise or not?
10             MR. HALPERIN:  No, Your Honor.
11             THE COURT:  You said there was another case.  Has
12   another judge looked at it and said it could come in because it
13   falls within the exception of — because it's not hearsay
14   because it's not tendered for the truth of the matter asserted?
15             MR. HALPERIN:  We don't have that case, Your Honor.
16   We have had four Connecticut trials to date.  We have got the
17   four trials, three in Connecticut under Connecticut state law
18   and the West Virginia case, the Knight case we referred to.  My
19   understanding is that this motion was not filed in West
20   Virginia.  There's no ruling from the court in West Virginia.
21             THE COURT:  I thought you said you had two cases
22   where this was admitted.
23             MR. HALPERIN:  Yes, Your Honor, two Connecticut
24   cases, both of which the first trial and second trial in
25   Connecticut.  There have now been three trials in Connecticut.

```
 1              THE COURT:  And it was unclear as to the basis for it
 2    being admitted in either of those two?
 3              MR. HALPERIN:  That's correct, Your Honor.
 4              THE COURT:  Is there anybody on your team that's
 5    going to testify that this article would be something
 6    reasonably relied — a reasonably relied-upon authority?
 7              MR. HALPERIN:  I think yes, Your Honor, we will have
 8    a witness who can sponsor the fact that that is reliable and
 9    certainly —
10              THE COURT:  All right.  I'm going defer ruling on it
11    until I hear that witness.  I may admit it as a learned
12    treatise exception.
13              MR. HALPERIN:  If we're able —
14              THE COURT:  I need to hear some more foundation about
15    that from a witness, the same as I need to hear that foundation
16    for their learned treatises.  I mean, I'll think about it some
17    more before the trial, but I'm having a hard time accepting
18    your argument that it's not hearsay at all because it's not
19    being tendered for the truth of the matter asserted.
20              MR. HALPERIN:  And, Your Honor, if we're able to make
21    that proffer, would we be then able to use it with plaintiff's
22    witnesses, given obviously the sequencing of the cases — of
23    the case?  Would we be able to use it with Dr. Plunkett, for
24    instance, if we can make that proffer that —
25              THE COURT:  Yeah, if you can convince me through an
```

1  expert that this is a reasonably reliable authority and meets

2  the requirements for a learned treatise, then you could use it

3  on cross-examination.  And we would treat it as a learned

4  treatise.

5          MR. HALPERIN:  Understood, Your Honor.  Thank you.

6          THE COURT:  I'm not sure the fact that it's not peer

7  reviewed is dispositive, Mr. Childers.  I think it depends on

8  whether it's considered to be a reasonably reliable authority

9  by people in this subject matter area.  I know you say it's an

10  editorial.  I think that's what they said about yours.

11          MR. CHILDERS:  We agreed we weren't going to put in

12  the opinion pieces, though, that they objected to on ours.

13          THE COURT:  Oh, opinion pieces.

14          MR. CHILDERS:  Yes, sir.  We had peer-reviewed —

15          THE COURT:  I'm going to wait and make a decision

16  after I hear what somebody in this field says about this

17  particular piece with regard to it being sufficiently reliable

18  to be a learned treatise.  And I'm going to give some more

19  concern to Mr. Halperin's well-made argument about it's not

20  being offered to come in for the truth of the matter asserted,

21  when that's exactly what — and I don't blame you.  That's

22  exactly what you want the jury to think:  It is the truth of —

23  it is true.

24          Okay.  We'll defer that one.  And you are going to

25  make some proffer before trial or before you want to use it in

```
 1   cross-examination in the plaintiff's case.
 2            What else, Mr. Childers?
 3            MR. CHILDERS:  That was our last issue.
 4            THE COURT:  You kind of struck out.  I didn't grant
 5   any of your motions in limine, did I?
 6            MR. CHILDERS:  That's okay.  It's not the first time.
 7            THE COURT:  I deferred every one of them, but I
 8   didn't deny them.
 9            MR. CHILDERS:  I have been there before.
10            THE COURT:  Okay.  With regard to the witness lists,
11   are there any — I want to just really know whether there's
12   anybody on anybody's list who has not been adequately disclosed
13   during discovery, that you just don't recognize them and they
14   were never disclosed.
15            Plaintiff, is there anybody on the defendant's
16   witness list that fits into that category?
17            MR. CHILDERS:  I don't believe so, Your Honor.
18            THE COURT:  Are there any other objections to their
19   witness list to the — by the plaintiff to the defendant's
20   witness list?
21            MR. CHILDERS:  I apologize.  I hadn't even thought
22   about that.  I don't recall —
23            THE COURT:  Other than if they have testimony that I
24   may have ruled out —
25            MR. CHILDERS:  That's it.
```

1          THE COURT:  —— in motions *in limine*.

2          MR. CHILDERS:  That's the only thing, Your Honor.

3          THE COURT:  Okay.  What about the plaintiff's witness

4    list?  Yes, sir.

5          MR. HALPERIN:  We have no nondisclosure objection,

6    Your Honor, beyond the extensive nature of the list that we

7    brought before Your Honor this morning.

8          THE COURT:  I think they are going to narrow that

9    down.

10         And I would encourage you, Mr. Childers, if you get

11   it narrowed down and you just know you are not going to use

12   somebody, go ahead and, as a matter of professional courtesy,

13   let them know.

14         MR. CHILDERS:  Yes, sir.

15         THE COURT:  Yes, sir, Mr. Halperin.

16         MR. HALPERIN:  Your Honor, one additional thing.

17   Just guided by Your Honor's comments this morning about

18   duplicative and cumulative evidence, we've got a whole host of

19   witnesses on that list that plaintiffs have identified as

20   "value of the decedent's life" witnesses.  To the extent that

21   they are going to put on multiple of those witnesses to retread

22   that same ground, we'd have a cumulative objection.

23         THE COURT:  Yeah.  I think I can best evaluate that

24   at the time of trial.  And I understand that you may have

25   certain witnesses who may want to testify about different

1    aspects of his life, and I think that's appropriate.  But I

2    just don't want all the grandkids coming forward saying,

3    "Granddad was a great guy."

4              MR. CHILDERS:  Yes, sir.

5              THE COURT:  Same thing over and over again.

6              MR. CHILDERS:  No, we understand that, Your Honor.

7              THE COURT:  Okay.  With regard to the exhibits, the

8    only thing I'm really concerned about is making sure that

9    everybody knows which exhibits they are going to have to

10   formally authenticate.  So if there's an asterisk by an exhibit

11   on the list, that would mean that there's no stipulation as to

12   authenticity.  Is that correct?  Did y'all asterisk ones that

13   there's no stipulation or that there is?

14             MR. CHILDERS:  That there's no stipulation.

15             THE COURT:  If there's an asterisk on an exhibit on

16   the list, it means that there's no stipulation as to

17   authenticity and so you have got to bring the custodian or have

18   the certificate or however you do it to authenticate the

19   document.  If there's no asterisk next to an exhibit, there's a

20   stipulation that it has been authenticated.  It may still not

21   be admissible, but you don't need to go through the

22   authenticity hoops.  So everybody clear on that?

23             Mr. Halperin.

24             MR. HALPERIN:  Yes, Your Honor.  Just for the record,

25   we put some asterisks next to some exhibits that we had not

1    seen at the time the joint proposed pretrial order was due.  We
2    may be able to resolve some of the objections.
3              THE COURT:  I'm going to let y'all provide me with a
4    final proposed pretrial order.  Can you do that by, say, 5 p.m.
5    tomorrow, or do you want until Monday, or what?  Are there
6    going to be many changes other than that with regard to the
7    exhibits?
8              MR. CHILDERS:  Your Honor, I would like to take out
9    some of this superfluous language that we each put in.
10             THE COURT:  How much time would y'all like to submit
11   a final ——
12             MR. CHILDERS:  Monday is fine.  I'm sorry, Your
13   Honor.  Go ahead.
14             THE COURT:  Monday at five?
15             MR. HALPERIN:  That should work on our end.
16             MR. CHILDERS:  There were a lot of things ——
17             THE COURT:  Monday at five ——
18             MR. CHILDERS:  I'm sorry, Your Honor.  Go ahead.
19             THE COURT:  Monday at five just e-mail the final
20   proposed pretrial order to wherever you mail it.  You'll figure
21   that out.
22             It will get to me, right, Mr. Gunn?
23             THE CLERK:  Yes, sir.
24             THE COURT:  All right.  And then deposition
25   designations.  We obviously need to —— I want to give y'all a

1  little more time on that so y'all can narrow this stuff down.

2          Did you try —— did you try the West Virginia case?

3          MR. CHILDERS:  I did, Your Honor.

4          THE COURT:  Did y'all play a bunch of videos?

5          MR. CHILDERS:  We played four corporate witnesses

6  during our case in chief, and we played two treating

7  physicians.  And then during the punitive damages phase, we

8  played one more corporate witness.

9          THE COURT:  So your live witnesses were just experts.

10         MR. CHILDERS:  And the family.

11         THE COURT:  And the family.

12         MR. CHILDERS:  Yes, sir.

13         THE COURT:  What about the defendant?

14         MR. CHILDERS:  They brought two live experts, and

15  they played one doctor video that was very short.

16         THE COURT:  Did y'all try this case?

17         MR. SCHMIDT:  One of my partners and Mr. Lewis

18  actually, Ms. Frost's partner, tried it.

19         THE COURT:  Oh, Mr. Lewis tried it.

20         MR. CHILDERS:  Mr. Lewis was on the other side, yes,

21  Your Honor.

22         MR. SCHMIDT:  The two of us were in Connecticut

23  trying the third Connecticut case.

24         THE COURT:  Well, if y'all have got 2500 of these

25  that they claim you are going to make them try, I mean, this is

1    retirement for all of y'all.  This takes you to the finish

2    line.

3            MR. SCHMIDT:  We certainly hope not, Your Honor,

4    unless retirement is one year from now, which I haven't figured

5    out.

6            THE COURT:  Okay.  For you, retirement is one year

7    from now?

8            MR. SCHMIDT:  No, I said unless it is.

9            THE COURT:  Oh, unless.

10           MR. SCHMIDT:  Which requires some lottery tickets

11   that I don't think are coming my way.

12           THE COURT:  Well, what do y'all think the best

13   deadline is for the deposition designation, keeping in mind

14   that I have got to decide the objections in enough time to get

15   you a ruling so y'all can edit the videotapes before trial?

16           MR. CHILDERS:  Your Honor, could we discuss and by

17   five on Monday let you know when we think that would be

18   appropriate so we could be on the same page?

19           THE COURT:  Yeah, but just keep in mind if there are

20   a lot of objections —

21           MR. CHILDERS:  I can tell Your Honor when we went

22   through this in the trial in West Virginia, it was narrowed

23   down to very, very few objections, and I expect that to happen

24   here.

25           THE COURT:  Y'all know where I'm coming from on these

1  other issues related to the motions *in limine,* so maybe that

2  will be helpful.  But just —— if you have objections, just keep

3  in mind I have got to review them and rule on them, and then

4  y'all have got to get it all edited before we start the trial.

5            MR. HALPERIN:  Yes, Your Honor.  If I could raise two

6  very brief things on the deposition designations ——

7            THE COURT:  Yes, sir.

8            MR. HALPERIN:  —— that I think would be helpful.

9            The first is, about a third of their —— there are

10  collectively currently 33 hours of deposition videos designated

11  in this trial.  I suspect and I certainly hope that that will

12  get narrowed significantly.  But about a third of that are

13  designations from the treating witnesses in this case.  There

14  were four treating witnesses who were deposed.  Before we go

15  through the effort, you know, the substantial time to negotiate

16  between ourselves over those objections and to take up any of

17  your time to resolve any of those objections, it would be

18  helpful if we knew whether the plaintiff was planning on

19  actually presenting them by video or via live testimony.

20  Plaintiff has thus far declined to give us that information.

21  We just don't want to be spinning our wheels and to be spinning

22  yours unnecessarily.

23            THE COURT:  I think that's reasonable if they know

24  whether the witness is going to be unavailable or not.  I

25  suspect that if it's doctors, then maybe that's the problem.

1   You don't know whether they are in surgery or not at last

2   minute.  I don't know that's an excuse but —

3          MR. CHILDERS:  And that is a concern we have.  That's

4   why we did designate the depositions for all of them, to make

5   sure we don't have any break in trial and we can continue if a

6   witness that we want to be here live can't be here live, we can

7   play it.  But we're still trying to figure out who —

8          THE COURT:  Why don't y'all figure out a time line

9   where the plaintiff can narrow it down, then get with the

10  defendant and maybe the defendant will be able — maybe you'll

11  have narrowed down designations for him to look at before he

12  just starts looking at everything.

13         MR. CHILDERS:  Understood, Your Honor.

14         THE COURT:  Y'all work that out as far as the time

15  line.

16         MR. CHILDERS:  Will do.

17         THE COURT:  For these treating physicians, you are

18  not going to go through all of his history and — can't you

19  just narrow it down to the essential of what — I mean, the

20  jury doesn't want to sit there and learn about he's had this

21  and everything in the world.  That's the problem with these

22  depositions.  If you have got the doctor here live, I can tell

23  you, "Let's move on past that," but I can't do that in your

24  depositions.

25         MR. CHILDERS:  I can promise you I'm not going to ask

1    those questions.  I didn't ask those questions in depositions.

2             THE COURT:  You did not.

3             MR. CHILDERS:  We stuck to the facts.  I can't tell

4    you that the defendants didn't go through his whole history.

5             THE COURT:  The defendant's side too.  I know in a

6    discovery deposition you want to try to find every needle in

7    the hay stack.  But I would say just view it from the

8    perspective if you had the doctor here live at trial would you

9    really ask him those questions.  That's what I see happening in

10   a lot of depositions for trial is they don't go through that

11   last hoop and say would I really ask him that if I had a jury

12   out here that was going to have to listen to it.

13            Okay.  What else, Mr. Halperin?

14            MR. HALPERIN:  I apologize.  I had a second point —

15            THE COURT:  No need to apologize.  This is your forum

16   today.

17            MR. HALPERIN:  Thank you, Your Honor.  The last

18   deposition designation issue we wanted to raise — and this is

19   really just to give the Court and opposing counsel notice of

20   it — is in the context of all those deposition videos, we

21   believe there's substantial cumulative testimony.  Obviously we

22   expect, and with Your Honor's guidance, we'll work to narrow

23   down those designation videos.  But to the extent that the

24   plaintiffs do present the same — in some instance it is the

25   same exhibit used with five or six different witnesses that are

1  currently designated.  We plan to object at trial in the event

2  that that becomes cumulative.  We just wanted to put a marker

3  down for Your Honor and for plaintiff's counsel as part of

4  those negotiations that we're going to —

5            THE COURT:  Well, I'm going to be sensitive to that,

6  to whether stuff is cumulative or not.  That doesn't mean that

7  two witnesses can't testify about the same thing if it's

8  something that's really central to the case and it's necessary.

9  But the less probative it is, then the less duplicative it

10  needs to be.

11            MR. HALPERIN:  Understood.  Thank you, Your Honor.

12            THE COURT:  All right.  So who are you with?  Are you

13  in Texas, or are you in New York?

14            MR. HALPERIN:  I'm actually neither.  I'm in

15  Washington D.C. at the same firm as Mr. Schmidt, in our D.C.

16  office.

17            THE COURT:  Okay.  You are with Mr. Schmidt's firm.

18            MR. HALPERIN:  Yes, sir.

19            THE COURT:  Okay.  I think I have covered — I have

20  covered everything on my list, and I think I have covered

21  everything on Mr. Callahan's agenda.  Does anybody else have

22  anything else?  Because I don't plan on us seeing each other

23  until the first Monday in December.

24            Mr. Childers?

25            MR. CHILDERS:  Your Honor, we don't have anything

1    else.  Thank you for your time.

2             THE COURT:  Mr. Schmidt.

3             MR. SCHMIDT:  Nor do we, Your Honor.  Thank you for

4    your time.

5             THE COURT:  No chance of working this out?  Did the

6    amount that each individual got in the Judge Herndon settlement

7    not appealing to you, or is that not even on the table?

8             MR. CHILDERS:  It's not on the table, Your Honor.  We

9    tried — doesn't matter.  There's been no offer made in the

10   case.

11            THE COURT:  Okay.  All right.  Well, that's what

12   we're here for.  We try cases.  We'll see you in December.

13        (Proceedings concluded at 1:00 p.m.)

14                      CERTIFICATE OF REPORTER

15             I, Betsy J. Peterson, Official Court Reporter of
     the United States District Court, in and for the Middle
16   District of the State of Georgia, Columbus Division, a
     Registered Professional Reporter, do hereby CERTIFY that the
17   foregoing proceedings were reported by me in stenographic
     shorthand and were thereafter transcribed under my direction
18   into typewriting; that the foregoing is a full, complete, and
     true record of said proceedings.

19

20                           This 2nd day of November, 2018.

21

22                           s/Betsy J. Peterson
23                           Betsy J. Peterson, CRR, RPR, CCR
                             Federal Official Court Reporter
24

25